4 P.3d 345

**STATE of Arizona, Appellee.**

v.

**Robert Glen JONES, Jr., Appellant.**

**No. CR–98–0537–AP.**

Supreme Court of Arizona,
En Banc.

June 15, 2000.

Janet A. Napolitano, The Attorney General by Paul J. McMurdie, Chief Counsel, Criminal Appeals Section, Phoenix, and Bruce M. Ferg, Assistant Attorney General, Tucson, for the State.

S. Jonathan Young, Tucson, for Jones.

## O P I N I O N.

McGREGOR, Justice.

¶ 1 Appellant Robert Jones appeals his convictions and death sentences for six counts of first-degree murder, and his convictions and sentences for one count of first-degree attempted murder, three counts of aggravated assault, three counts of armed robbery, and two counts of first-degree burglary.[1] We review this case on direct, automatic appeal pursuant to article VI, section 5.3 of the Arizona Constitution, Arizona Rules of Criminal Procedure 26.15 and 31.2.b, and Arizona Revised Statutes Annotated (A.R.S.) section 13–4031. For the following reasons, we affirm the appellant's convictions and sentences.

## I.

¶ 2 David Nordstrom (David), the state's key witness, was released from prison in January 1996, after serving his sentence for a theft conviction. At that time, he took up residence in his father's home in Tucson, where he was under "home arrest" status and monitored by an ankle monitor. The home arrest was related to his prior theft conviction, and as a term of the arrest, he had to be inside his father's home by a certain time every evening. During this period of home arrest, he reestablished his friendship with the defendant, Robert Jones (Jones). Scott Nordstrom (Scott), David's brother, also returned to Tucson and spent time with David and Jones.

¶ 3 Sometime before April 1996, David obtained a .380 semiautomatic pistol from a friend, which he gave to Jones after Jones requested it for protection. On May 30, 1996, Scott and Jones picked up David in Jones's truck, an old white Ford pickup. Jones was wearing his usual attire: a long-sleeved western shirt, Levi's, boots, sunglasses, and a black cowboy hat. In a parking lot near the Tucson Medical Center, Jones spotted a car that he thought he could steal. Although he failed to start the car, Jones found a 9mm pistol under the seat and

left with it, stating, "I've got my gun now." (R.T. 6/23/98, at 103–04.)

¶ 4 As the three continued driving, they began discussing the possibility of a robbery, and Jones gave Scott the .380 pistol. Jones then suggested that they rob the Moon Smoke Shop. He parked behind the store, telling David he and Scott would go in, rob it, and be right out. David then heard gunfire from inside, after which, Jones and Scott left the shop and jumped into the truck. David drove up the alley, exited onto the surface street, and headed toward the freeway. Jones stated, "I shot two people," and Scott stated, "I shot one." (*Id.* at 113.) Jones then split the money from the robbery with David and Scott.

¶ 5 The survivors from the robbery testified that four employees were in the store at the time of the robbery: Noel Engles, Tom Hardman, Steve Vetter, and Mark Naiman, a new employee on the job for the first time. Just before the robbery, Engles was standing behind the counter, and Vetter and Naiman were kneeling behind it. Hardman was sitting behind another counter, and no customers were in the store. Jones and Scott followed a customer, Chip O'Dell, into the store and immediately shot him in the head. As the door buzzer indicated someone had entered the store, Engles, Vetter, and Naiman all heard the gunshot. Because all three were concentrating on the stock behind the counter, however, none of them saw the robbers or O'Dell enter. Engles looked up to see a robber in a long-sleeved shirt, dark sunglasses, and a dark cowboy hat wave a gun at him and yell to get down. Naiman recognized the gun as a 9mm.

¶ 6 Engles noticed a second robber move toward the back room and heard someone shout, "Get the fuck out of there!" (R.T. 6/18/98, at 47.) Engles dropped to his knees and pushed an alarm button. The gunman at the counter nudged Naiman in the head with his pistol and demanded that he open the register. After he did so, the gunman reached over the counter and began firing at the others on the floor. Thinking the others

---

1. Jones filed a notice of appeal from the noncapital convictions, but did not brief these issues on appeal. We, therefore, affirm these convictions and sentences. *See State v. Greene*, 192 Ariz. 431, 444 n. 2, 967 P.2d 106, 119 n. 2 (1998); Ariz. R.Crim. P. 31.2.b.

were dead, Naiman ran out of the store and called 911 at a payphone. On the floor behind the counter, Engles heard shots from the back room and, realizing the gunmen had left the store, ran out the back door. While running up the alley to get help, he saw a light-colored pickup truck carrying two people, which turned sharply onto the surface street, despite heavy traffic. All survivors agreed that no one had offered any resistance to the gunmen, and that the shootings were completely unprovoked.

¶ 7 Naiman and Engles survived, as did Vetter, despite the shots to his arm and face. Chip O'Dell died from a bullet through his head, which had been fired from close range. Hardman, who had fled to the back room when the gunmen entered, had been shot fatally in the head from above as he lay on the floor. Three 9mm shell casings were found in the store, one beside Mr. O'Dell and two near the cash register. Two .380 shells were found near Hardman's body. Two weeks after the robbery, Naiman met with a police sketch artist who used his description of one of the gunmen to create a composite drawing.

¶ 8 Two weeks after the Moon Smoke Shop robbery, the Fire Fighters Union Hall was robbed. The Union Hall was a club owned by the firefighters and their guests, which contained a bar, bingo hall, and snack bar. Members entered using key cards, and the bartender buzzed in guests. When member Nathan Alicata arrived at 9:20 p.m., he discovered the bodies of member Maribeth Munn, the bartender, Carol Lynn Noel, and a couple, Judy and Arthur "Taco" Bell.

¶ 9 During the ensuing investigation, the police found three 9mm shell casings, two live 9mm shells, and two .380 shell casings. Approximately $1300 had been taken from the open cash register. The coroner, who investigated the bodies at the scene, concluded that the bartender, Carol, had been shot twice, and that the other three victims were shot through the head at close range as their heads lay on the bar. Carol also suffered blunt force trauma which caused a bleeding laceration to the side of her mouth, and Arthur had a contusion on the right side of his head in a shape consistent with a pistol.

¶ 10 David Nordstrom testified at trial that on the day of the Union Hall murders, his brother Scott gave him a ride home, where he remained the rest of the evening. David's parole officer produced records at trial verifying that David's ankle-monitoring unit indicated he had not left his father's home on the night of the murders. Late that evening, Jones entered David's father's house and began telling David what had happened. Jones admitted to David that he and Scott had robbed the Union Hall. He stated that because the bartender could not open the safe, Scott kicked her and shot her. Jones said he then shot the three other witnesses in the back of the head. Jones, Scott, and David disposed of the guns by throwing them into a pond south of Tucson, and Scott and David burned one of the victim's wallets at another location.

¶ 11 David kept the secret until he saw an appeal on the television for information. At that time, he told his girlfriend, Toni Hurley, what he knew. Hurley eventually made an anonymous 88–CRIME call, which led to David's contact with the police, and an ultimate release of the information.

II.

¶ 12 Jones appeals his convictions and sentences on eleven grounds. For the reasons discussed below, we uphold the convictions and sentences.

A.

¶ 13 Jones's first point of error concerns the use of prior consistent statements to rebut recent charges of fabrication. Jones argues that in each instance, the witness's statement was actually made *after* that witness had motive to fabricate. Specifically, Jones objected to the following testimony: (1) David Nordstrom's out-of-court statements to Toni Hurley and the police, introduced at trial through Hurley's testimony, (2) David Evans's out-of-court statements to detectives, introduced at trial through Detective Edward Salgado's testimony, and (3) Lana Irwin's out-of-court statements to the police, introduced at trial by Detective Brenda Woolridge.

¶ 14 Arizona Rule of Evidence 801(d)(1)(B) provides that an out-of-court statement is not hearsay if the declarant testifies at trial, is available for cross-examination, and the statement is "consistent with the declarant's testimony and is offered to rebut an express or implied charge against the declarant of recent fabrication or improper influence or motive." This rule requires the statement to have been made *before* the motive to fabricate arose:

> The only way to be certain that a prior consistent statement in fact controverts a charge of "recent fabrication or improper influence or motive" is to require that the statement be made at a time when the possibility that the statement was made for the express purpose of corroborating or bolstering other testimony is minimized.

*State v. Martin,* 135 Ariz. 552, 554, 663 P.2d 236, 238 (1983). The timing requirement applies, regardless whether the witness is accused of recent fabrication, bad motive, or improper influence. *See id.* Thus, to determine admissibility, the court must decide (1) whose credibility the statement bolsters, and (2) when that particular witness's motive to be untruthful arose. In this case, because both David Evans's and Lana Irwin's prior statements were used to bolster their own testimony and were made before their motives to fabricate arose, they were properly admitted under Rule 801. David Nordstrom made his prior statements, however, after his motive to fabricate arose. Therefore, the trial court erred in admitting them.

¶ 15 First, Evans testified at trial that he had a conversation with Jones, in which Jones stated the police were on to him and knew that he had committed the murders. Evans also admitted he was receiving a plea bargain in two cases in exchange for his testimony. To rebut this motive to fabricate, the state questioned Detective Salgado concerning Evans's consistent statements to the police. Salgado testified that not only did Evans not ask for anything when he voluntarily contacted the police with the information, but that at the time of his original statements, he had not been arrested for any crime. During that original conversation with the police, Evans stated that Jones had admitted he needed to leave town because he had killed some people. Evans was not, however, offered a deal to testify until later. Thus, he had no motive to fabricate this original statement, and it was admissible under Rule 801. When the defense objected at trial, the trial court determined the prior consistent statements were admissible because they aided the jury in determining Evans's credibility. Because the defense called Evans's credibility into question through its cross-examination, the prior consistent statements were made before his motive to fabricate arose, and the statements were used to bolster Evans's credibility, the trial court did not abuse its discretion in admitting them.

¶ 16 Second, Jones argues that the trial court improperly admitted Lana Irwin's prior consistent statements to the police, despite the fact that her motive to fabricate had already arisen at the time of her statement. Irwin testified at trial that she overheard Jones say he had murdered four people in Tucson. Because she feared Jones's retaliation, however, she originally told the detectives about a "dream" she had. In the dream, the victims were killed exactly as Jones had described it. To bolster Irwin's credibility, Detective Brenda Woolridge later testified that when she and another detective originally went to the Maricopa County Jail to question Irwin, they offered her absolutely no deal. In fact, Irwin initially refused to speak with them. It was only when they began to leave that Irwin stated she had the "dream." The defense objected to the detective's testimony concerning Irwin's "dream" as hearsay. The trial judge, however, admitted her statements to the police, relying on Rule 801. This admission was proper. Based on the evidence, Irwin did not have a motive to fabricate at the time of her original statements. She had been offered no deal prior to the statements, and the deal that she eventually received was negligible.[2] Because

---

2. Irwin's charge of possession of marijuana was dropped in exchange for her testimony. Yet, she only possessed half a marijuana cigarette and was able to bail herself out of jail. Had she been convicted, she could have resolved the issue by spending six weeks in a rehabilitation center.

the statements were made by Irwin prior to her motive to fabricate and introduced to bolster Irwin's testimony, the trial court did not err in admitting them under Rule 801.

■ ¶ 17 Third, Jones claims that David Nordstrom's statements to both the police and Toni Hurley were erroneously admitted under Rule 801 because they were actually made after his motive to fabricate arose. At trial, the state offered Toni Hurley's testimony that David had made prior consistent statements to her concerning the murders for the purpose of bolstering David's testimony. The court admitted these statements under Rule 801. The defense's primary trial theory was that David actually perpetrated the murders, and because he happened to resemble Jones, decided to blame Jones as soon as they happened. Thus, when David told Hurley and the police what Jones had said and done, he was already plotting to lie about Jones's involvement in the case, even though David was not yet considered a suspect. Assuming Jones's theory was true, David's motive to fabricate necessarily arose at the time of the murders. *See State v. Jeffers,* 135 Ariz. 404, 424, 661 P.2d 1105, 1125 (1983). If David actually participated in all of the killings, his decision to shift the blame to Jones presumably formed immediately upon the deaths. It would have been in David's best interest to plant the seeds of this deception before he became a suspect, by telling Hurley and the police that Jones was the true murderer. Thus, because David's motive to fabricate arose at the time the murders occurred, rather than at the time of his arrest, the trial court improperly admitted his prior statements under Rule 801. We find, however, that admitting this testimony was harmless error.

■ ¶ 18 The defense's primary theory at trial was that David himself was the murderer and was merely blaming his bad deeds on the innocent defendant. To support this theory, the defense attacked David's credibility on every basis. It pointed out that David was a convicted felon, habitually used drugs and alcohol, violated the terms of his proba-

tion, did not obtain steady employment, possessed illegal firearms, violated his curfew, falsified his employment records, and lied to the police. On the stand, the defense impeached him numerous times with his prior inconsistent statements to the police. The defense argued that David was receiving virtually no punishment for his participation in the Moon Smoke Shop murders in exchange for his testimony. Finally, it argued in both opening and closing statements its theory that David was the true murderer. Yet, even in light of the defense's extensive attempts to impeach David and the multiple attacks on his veracity, the jury chose to convict Jones on every count of murder. We do not believe that had Toni Hurley's testimony concerning David Nordstrom's prior statements been excluded, the jury would have suddenly regarded David as a liar. David's credibility as a witness did not hinge on these prior consistent statements. Moreover, even if Hurley's testimony had been excluded, all of David's testimony about Jones's involvement and admissions would still have been admissible. Therefore, although the statements were erroneously admitted under Rule 801, we find no reversible error.

### B.

■ ¶ 19 Jones next argues that the prosecutor's threat to prosecute defense witness Zachary Jones[3] (Zachary) for perjury, regardless of how Zachary testified, violated the defendant's right to a fair trial, due process right to present a defense, and compulsory process rights under U.S. Constitution Amendments V, VI, VIII, and XIV, and Arizona Constitution article II, sections 4 and 24, because it prevented the defense from rebutting the testimony of the prosecution's primary witness. According to a defense interview with Zachary, while David Nordstrom, the state's star witness, was in jail following his arrest for his participation in the murders, Zachary overheard David tell another inmate, "Yeah, there's someone out there who's almost my twin brother who I

---

Thus, the dismissal of the charges probably was not a great inducement to fabricate her testimony.

3.  Zachary Jones is not related to the defendant.

can lay all my bad deeds on, so I have a second chance at life." (R.O.A. at 323.) The defense made an offer of proof of Zachary's testimony at a pre-trial hearing on June 17, 1998. Defense counsel told the court that he had spoken with Zachary's attorney, who said Zachary might invoke the Fifth Amendment. As a result, defense counsel was not certain whether Zachary would testify. During this discussion, the prosecutor volunteered to the court why Zachary might invoke the Fifth Amendment:

[Prosecutor]

I am putting this on the record so that the Court understands the context of why Mr. Zachary Jones may have a valid Fifth Amendment claim here.

The Court has heard Mr. Larsen's [defense counsel] recitation of what Mr. Zachary Jones has previously said.

It is the State's belief, and I believe we have a witness who will testify if need be, that there was a conspiracy in the Pima County Jail on the part of Mr. Robert Jones and other inmates to solicit inmates to fabricate accounts about David Nordstrom bragging that he had pulled the wool over the State's eyes and he had really been personally responsible for these killings.

. . . .

If he comes into court and says and sticks with the account that Mr. Larsen has given and I can prove that this is false, he is committing perjury.

If he comes into court and says, and I think there is some possibility that, okay, you know, I didn't ever have this conversation with David Nordstrom, he is admitting to participating in a conspiracy to commit perjury because he will have to admit that he agreed with Robert Jones to falsify the story. . . .

(R.T. 6/17/98, at 7–8.) The prosecutor neither contacted Zachary directly, nor spoke to Zachary's attorney. Instead, he explained to the court his analysis of the reasons Zachary might choose to invoke his Fifth Amendment rights. Six days into trial, when the defense attempted to call Zachary as a witness, Zachary's counsel informed the court that he might be liable for perjury, regardless of how

he testified, and the prosecutor again confirmed the possibility in open court. Zachary consulted with his attorney and asserted his Fifth Amendment rights. These facts do not amount to prosecutorial misconduct.

¶ 20 We will disturb the trial court's decision not to grant a mistrial for prosecutorial misconduct only for an abuse of discretion. *See State v. Lee,* 189 Ariz. 608, 616, 944 P.2d 1222, 1230 (1997). Jones cites to *United States v. Vavages,* 151 F.3d 1185 (9th Cir. 1998), for the proposition that a prosecutor's threat of a perjury prosecution to a defense witness constitutes witness intimidation and is improper. The facts of the present case, however, are distinguishable. In *Vavages,* the court agreed that "there . . . [was] no question that the prosecutor was justified in contacting . . . [the defense witness's] counsel, cautioning him against his client's testifying falsely, and informing him of the possible consequences of perjurious testimony." *Id.* at 1190. The court was concerned, however, with three aspects of the prosecutor's behavior: (1) his articulation to the witness of his belief that the testimony would be false, (2) his threat to withdraw the witness's plea agreement in an unrelated case, and (3) the use of the absence of the testimony to refute the defense's alibi during closing argument. *See id.* at 1190–91; *see also Webb v. Texas,* 409 U.S. 95, 97–98, 93 S.Ct. 351, 353, 34 L.Ed.2d 330 (1972) (finding that the judge's threatening remarks to the sole defense witness drove him off the stand).

¶ 21 Here, however, the prosecution's statements did not constitute a threat. In fact, according to the record, as relied upon in Jones's own brief, the prosecutor's remarks were made to the court to explain Zachary's somewhat confusing decision to invoke the Fifth Amendment. Nothing in the record indicates that the prosecutor contacted Zachary directly, or made any personal threats to Zachary concerning his testimony. Nor did the prosecutor ever actually say that he would pursue a conviction, regardless of how Zachary testified. He simply stated his understanding of the reasons Zachary might refuse to testify. There is no *per se* prosecutorial misconduct when the prosecutor mere-

ly informs the witness of the possible effects of his testimony. *See State v. Dumaine,* 162 Ariz. 392, 400, 783 P.2d 1184, 1192 (1989). In addition, counsel represented Zachary and advised him as to whether he should testify. Thus, Zachary's decision followed consultation with and advice from his own attorney. Absent some substantial governmental action preventing the witness from testifying, a witness's decision to invoke the Fifth Amendment does not suggest prosecutorial misconduct.

¶ 22 Finally, Jones argues that the trial court erred by failing to *sua sponte* grant immunity to Zachary in exchange for his testimony. Jones failed, however, to make any objection or motion to this effect at trial. No court has held that the constitutional burden to meet the Sixth Amendment's Confrontation Clause shifts to the trial court in the absence of the defense counsel's motion or request to grant such immunity. At the very least, Jones waived the argument that the court should have granted him immunity by failing to pursue the remedy at trial. For these reasons, we reject the defendant's second point of error.

### C.

¶ 23 Jones's third point of error concerns the life-and death-qualification of the jury. Jones argues that once the trial court denied his motion to prohibit death-qualification, the only standard that could be applied was that defined in *Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). He further argues that when the court allowed the prosecution the opportunity to death-qualify, the defendant should have been entitled to life-qualify under *Morgan v. Illinois,* 504 U.S. 719, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992). Although the court denied the defendant's request to apply *Witherspoon* and *Morgan* on improper grounds, the court effectively met the constraints of both tests during its voir dire questioning. Therefore, the trial court's denial constituted harmless error.

¶ 24 We have recognized that death-qualification is appropriate in Arizona, even though juries do not sentence: "[W]e have previously rejected the argument that, because the judge determines the defendant's sentence, the jury should not be death qualified. We have also repeatedly reaffirmed our agreement with *Witherspoon v. Illinois* and *Adams v. Texas." State v. Van Adams,* 194 Ariz. 408, 417, 984 P.2d 16, 25 (1999) (citations omitted). Even more importantly, however, this Court has applied and adopted the more liberal *Wainwright v. Witt,* 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1955), test. *See State v. Anderson,* 325 Ariz. Adv. Rep. 3, 197 Ariz. 314, 4 P.3d 369 (2000). In *Wainwright,* the Supreme Court took a step back from the rigid test articulated in *Witherspoon,* which required the prospective juror to unequivocally state that he could not set aside his feelings on the death penalty and impose a verdict based only on the facts and the law, and held that a juror was properly excused from service if the juror's views would " 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.' " *Wainwright,* 469 U.S. at 424, 105 S.Ct. at 852 (quoting *Adams v. Texas,* 448 U.S. 38, 45, 100 S.Ct. 2521, 2526, 65 L.Ed.2d 581 (1980)). The trial judge has the power to decide whether a venire person's views would actually impair his ability to apply the law. For this reason, "deference must be paid to the trial judge who sees and hears the juror." *Id.* at 426, 105 S.Ct. at 853. Thus, we recognize that the trial judge has discretion in applying the test; the inquiry itself is more important than the rigid application of any particular language.

¶ 25 Although the trial judge incorrectly stated that the *Witherspoon/Wainwright* standard did not apply because Arizona juries do not sentence defendants, in fact his approach complied with the constraints of *Witherspoon/Wainwright.* The trial court, in agreement with both parties, submitted written juror questionnaires at the outset of voir dire. These questionnaires were available to the parties after the venire persons completed them. The parties then conferred about which persons to strike based on the answers given. The questionnaire contained the following question:

If Robert Jones is convicted of one or more counts of first degree murder in this case, it is a legal possibility that he could receive a sentence of death. In Arizona, a jury only decides the question of whether the defendant is guilty or not guilty; the jury does *not* decide the sentence to be imposed, nor does it make any recommendation to the court on the sentence to be imposed. The matter of the possible punishment is left solely to the court. Therefore, if you serve as a juror in this case, you will be required under your oath to disregard the possible punishment and not to let it affect in any way your decision as to guilty [sic] or innocence. *Can you disregard the possible punishment and decide this case based on the evidence produced in court?*

(Emphasis in original.) Defense counsel stated only that "[w]ithout waiving my request for my version of a questionnaire," he agreed to the proposed process. (R.T. 5/4/98, at 9.) He did not object to the trial court's particular question before the questionnaires were submitted. After the questionnaires were filled out and analyzed by the parties, the lawyers agreed to dismiss thirty jurors for cause because those persons had indicated that they could not set aside their beliefs about the death penalty or their opinions already formed from media coverage. The defense did not object to the dismissals, nor request to further question any of the dismissed venire persons. The court then informed the attorneys that they should call attention to any additional questions that should be asked concerning the death penalty. The court dismissed another juror for cause because that juror stated he could not set aside his feelings on the death penalty. No other potential juror expressed this view. The defense then asked that the trial court pose additional specific questions concerning the death penalty. The court declined, stating that the questionnaires adequately addressed the issue, but agreed to inquire further whether any of the remaining jurors felt strongly about the death penalty, one way or the other. The judge reminded the jurors of the questionnaire, and asked them if they felt strongly about the death penalty. Three persons responded that they supported its imposition. Once again, defense counsel failed to object or request additional questions (although he did later strike these jurors with his peremptory strikes). Both parties passed the panel with no further objections.

¶ 26 In light of these facts, the trial court did not abuse its discretion. Not only did it ask the appropriate *Witherspoon/Wainwright* question in the questionnaire and to the remaining panel, but the defense counsel failed to object at any time to the questions. Thus, the court's procedure met the *Witherspoon/Wainwright* test.

¶ 27 Likewise, although the trial court did not specifically apply *Morgan v. Illinois,*[4] 504 U.S. 719, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992), it also satisfied the constraints of this test through voir dire. Jones essentially argues that the trial court should have applied a reverse-*Witherspoon* test under *Morgan.* In *Morgan,* the Supreme Court held that a jury pool containing prejudiced jurors, be it toward one extreme or another, could not effectively pass judgment in a capital case. In *Witherspoon,* the Court was concerned that a juror who felt so strongly against the death penalty that he could not set aside his belief and follow the evidence and the law could not make an unbiased determination concerning the sentence. *Morgan* recognizes the opposite extreme: defendants have a right to know whether a potential juror will automatically impose the death penalty once guilt is found, regardless of the law. Thus, defendants are entitled to address this issue during voir dire.

¶ 28 *Morgan,* however, does not require the trial court to life-qualify the jury in the absence of the defendant's request. *See United States v. McVeigh,* 153 F.3d 1166, 1206 (10th Cir.1998) ("upon a defendant's request, a trial court is obligated to ensure that prospective jurors are asked sufficient questions"); *United States v. Tipton,* 90 F.3d 861, 879 (4th Cir.1996) ("The right to any inquiry on this subject is dependent upon request...."). The trial court is under no

4. Because judges, rather than jurors, sentence in Arizona, we have never held *Morgan* applies.

obligation to question the venire persons endlessly concerning other topics, even if those questions might indicate an affinity for the death penalty. *See Trevino v. Johnson,* 168 F.3d 173, 183 (5th Cir.1999).

¶ 29 Here, the defense counsel never submitted questions to the trial court articulating the *Morgan* question. During voir dire, the court specifically asked if any of the jurors had strong feelings about the death penalty, *either way.* Three people responded that they favored its application, and all three were removed by the defense with its peremptory strikes. The defense did not object to the failure to remove for cause, and failed to request any additional questions. Although the trial judge did not rigidly apply *Morgan,* he sought and obtained the required information from the panel. For these reasons, we reject Jones's third point of error.

### D.

¶ 30 Jones next argues that the trial court abused its discretion by allowing David Nordstrom to testify (1) about Jones's status as a paroled felon, (2) that following the murders, Jones borrowed duct tape to use in a subsequent robbery, and (3) that Jones was subsequently incarcerated in Phoenix. Jones argues that danger of unfair prejudice outweighed the probative value of these statements.

¶ 31 First, through unsolicited testimony, David Nordstrom mentioned on the stand that after Jones dyed his hair brown, he asked David for a roll of duct tape for use in another robbery. Shortly thereafter, when asked why he refused to return Jones's telephone calls, David responded that he knew Jones was in jail and had no desire to call him there. After David made several similar statements, the defense moved for a mistrial.

¶ 32 When unsolicited prejudicial testimony has been admitted, the trial court must decide whether the remarks call attention to information that the jurors would not be justified in considering for their verdict, and whether the jurors in a particular case were influenced by the remarks. *See State v. Stuard,* 176 Ariz. 589, 601, 863 P.2d 881,

893 (1993). When the *witness* unexpectedly volunteers information, the trial court must decide whether a remedy short of mistrial will cure the error. *See State v. Adamson,* 136 Ariz. 250, 262, 665 P.2d 972, 984 (1983). Absent an abuse of discretion, we will not overturn the trial court's denial of a motion for mistrial. *See id.* The trial judge's discretion is broad, *see State v. Bailey,* 160 Ariz. 277, 279, 772 P.2d 1130, 1132 (1989), because he is in the best position to determine whether the evidence will actually affect the outcome of the trial. *See State v. Koch,* 138 Ariz. 99, 101, 673 P.2d 297, 299 (1983). In this case, the comments did not create undue prejudice, and the trial court did not abuse its discretion.

¶ 33 Defense counsel did not request any curative instruction, because he felt it would only draw attention to the remarks. The court refused to grant the motion for mistrial, finding that David did not testify that a robbery actually occurred, and that the jury probably would assume Jones was in jail for the immediate crimes. Furthermore, the prosecutor avowed that the remarks were both unexpected and unsolicited. The prosecutor informed the court that David had been fully instructed about the areas he was not permitted to discuss under the *in limine* rulings. For these reasons, the trial court concluded that a limiting instruction would cure any prejudice. The jury was instructed:

> Ladies and gentlemen, references have been made in the testimony as to other alleged criminal acts by the defendant unrelated to the charges against him in this trial. You are reminded that the defendant is not on trial for any such acts, if in fact they occurred. You must disregard this testimony and you must not use it as proof that the defendant is of bad character and therefore likely to have committed the crimes with which he is charged.

(R.T. 6/23/98, at 143–44.) During redirect, David responded to a question with the statement that his brother Scott and Jones were both convicted felons. Only when the counsel later approached the bench to consider questions submitted by the jury, however, did the defense renew its motion for a mistrial. Once again, the trial court determined

that the error could be cured through a limiting instruction, and repeated the instruction set out above.[5]

¶ 34 Arizona has long recognized that testimony about prior bad acts does not necessarily provide grounds for reversal. *See, e.g., State v. Stuard,* 176 Ariz. 589, 601–02, 863 P.2d 881, 893–94 (1993) (holding that a trial judge's limiting instruction and striking of the offending statements cured the defects); *State v. Bailey,* 160 Ariz. 277, 279–80, 772 P.2d 1130, 1132–33 (1989) (holding that a remark that the defendant had been in jail did not require a mistrial because "[e]ven if the members of the jury reached that conclusion, they would have no idea how much time he spent in prison or for what crime"). Here, the testimony made relatively vague references to other unproven crimes and incarcerations. Furthermore, the judge gave an appropriate limiting instruction, without drawing additional attention to the evidence.

¶ 35 Second, unlike the primary case on which Jones relies, *Dickson v. Sullivan,* 849 F.2d 403 (9th Cir.1988), in which a court official told jurors of the defendant's previous involvement in a similar case, the statements here were unsolicited descriptions from a witness concerning a dissimilar crime. When the statements are made by a witness, whose credibility is already at issue, they do not carry the same weight or effect as a statement from a court official, who is presumed to uphold the law. The defendant agreed during trial that the prosecution played no part in soliciting the information from David. Therefore, the statements are not as harmful as those made in *Dickson,* and the trial court did not abuse its discretion.

### E.

¶ 36 Jones's fifth point of error concerns statements the prosecution made during closing arguments. During the arguments, the prosecutor made reference to the death penalty, compared Jones to Ted Bundy and John Wayne Gacy, and asked the jury to return a guilty verdict on behalf of the victims and their families. The defense moved for a mistrial, and its motion was denied. Although we agree that some of the prosecutor's statements were inappropriate, for the following reasons, we uphold the trial court's decision.

¶ 37 Misconduct by the prosecutor during closing arguments may be grounds for reversal because he is a public servant whose primary interest is the pursuit of justice. *See Berger v. United States,* 295 U.S. 78, 55 S.Ct. 629, 79 L.Ed. 1314 (1935). To determine whether a prosecutor's remarks are improper,

> [t]he trial court should consider (1) whether the remarks call to the attention of the jurors matters that they would not be justified in considering in determining their verdict, and (2) the probability that the jurors, under the circumstances of the particular case, were influenced by the remarks. Misconduct alone will not mandate that the defendant be awarded a new trial; such an award is only required when the defendant has been denied a fair trial as a result of the actions of counsel. The trial court is in the best position to determine whether an attorney's remarks require a mistrial, and its decision will not be disturbed absent a plain abuse of discretion.

*State v. Hansen,* 156 Ariz. 291, 296–97, 751 P.2d 951, 956–57 (1988) (citations omitted). Furthermore, prosecutors have wide latitude in presenting their closing arguments to the jury: "excessive and emotional language is the bread and butter weapon of counsel's forensic arsenal, limited by the principle that attorneys are not permitted to introduce or comment upon evidence which has not previously been offered and placed before the jury." *State v. Gonzales,* 105 Ariz. 434, 436–37, 466 P.2d 388, 390–91 (1970). In this case, the prosecutor's statements did not rise to the level of misconduct.

¶ 38 Jones argues that the prosecution's reference to the death penalty in closing argument constituted reversible error. We have recognized that calling atten-

---

**5.** Jones later waived the giving of any cautionary instructions during the final instructions to the jury.

tion to the possible punishment is improper because the jurors do not sentence the defendant. *See State v. Cornell*, 179 Ariz. 314, 327, 878 P.2d 1352, 1365 (1994). Jones, however, has taken the challenged statement out of context.

¶ 39 In the midst of his closing, during his explanation of reasonable doubt, the prosecutor made a single reference to the death penalty:

This is a first-degree murder case and one of the possible sentences—it's up to the Judge, of course—is the death penalty. The State has to prove a case beyond a reasonable doubt, and that burden, beyond a reasonable doubt, is exactly the same in this case as it is in a burglary case or a drunk driving case. The burden does not get higher because of the nature of the charges.

(R.T. 6/25/98, at 98–99.) This statement is the only reference to the death penalty in over 100 pages of closing argument. Jones did not ask for a curative instruction; he only made a general objection. We hold the statement does not constitute reversible error because it does not violate either of the concerns in *Hansen*.

¶ 40 First, the reference to the death penalty does not call attention to a fact that the jurors would not be justified in considering during their deliberations. In fact, the prosecutor stated that the possibility of the death penalty should *not* influence a determination of reasonable doubt. Second, the probability that the statement improperly influenced the jurors was very low. The jurors had been told from the very beginning of the trial, through both direct statements and voir dire questions, that the prosecution was seeking the death penalty. The prosecutor did not commit misconduct by making a brief reference to the death penalty in the context of discussing the burden of proof.

¶ 41 The second statement at issue concerns the reference to noted serial killers. Jones argues that these references were irrelevant and used only to inflame the jury. During the closing, the prosecutor stated:

The defendant is a nice guy. He's polite. I don't think there is any natural law

or genetic evidence that murders aren't also polite. Have you heard of Ted Bundy? John Wayne Gacy? Serial murderers, and I am not calling him a serial murders [sic], who were very polite. Politeness has nothing to do with it.

(R.T. 6/25/98, at 193.) The state concedes that there was no mention of either Bundy or Gacy during the actual trial. It does not agree, however, that the prosecutor necessarily committed error when referring to them. Lower courts have recognized that jurors may be reminded of facts that are common knowledge. *See State v. Adams*, 1 Ariz.App. 153, 155, 400 P.2d 360, 362 (1965). The prosecutor, by referring to famous serial killers, did not introduce evidence completely outside the realm of the trial, but rather drew an analogy between Jones's attitude at trial and that of well-known murderers. The error, if any, could not have affected the outcome of the trial.

¶ 42 Finally, Jones argues that the prosecution's plea for a guilty verdict on behalf of the victims and their families requires a reversal. Although this reference involves more questionable statements, it does not rise to the level of misconduct.

¶ 43 In *State v. Ottman*, we held that the prosecutor's statements concerning the victim's wife were improper, but did not reverse because the trial court gave a limiting instruction. 144 Ariz. 560, 562, 698 P.2d 1279, 1281 (1985). The facts of that case are far more egregious than those considered here. In *Ottman*, the prosecutor asked the jury to

think of another woman [the victim's wife] who will be waiting for your verdict too.

On December 16th at about 7:30 in the evening she had everything to look forward to. She had her house here, they were retired, husband had a part-time job, her children are fine and well in New Jersey and at 9:30 she's at the hospital with her husband and he's dead. I can guarantee you that her life is totally destroyed. She had nothing to look forward to, nothing.

You may think sympathy for someone else but in terms of that woman, she wants justice and that's your duty to as jurors.

*Id.* Yet, even in light of these emotional remarks, we found any error was cured because the trial judge admonished the jury to ignore statements invoking sympathy. In contrast, the prosecutor in this case made a single remark: "I ask that you find him guilty on behalf of those people and their families and the people of the State of Arizona." (R.T. 6/25/98, at 194.) The prosecutor did not attempt to inflame the jury or make an emotional plea to ease the suffering of the poor families. Those statements do not rise to the level of misconduct. Thus, the trial court properly denied the motion for a mistrial. *See also State v. Bible,* 175 Ariz. 549, 603, 858 P.2d 1152, 1206 (1993) (rejecting the defendant's claim that statements concerning victim's rights in the prosecutor's closing arguments did not constitute fundamental error because, coupled with the weight of the evidence against the defendant, he was not denied a fair trial). For these reasons, we reject Jones's fifth point of error.

F.

▇▇▇▇ ¶ 44 Jones next asserts that the trial court erred when it failed to grant his motion to transfer venue because of pretrial publicity. For venue issues, we are concerned with the prejudicial *effect* of pretrial publicity, rather than merely the *amount* of publicity. *See State v. Greenawalt,* 128 Ariz. 150, 162, 624 P.2d 828, 840 (1981). We have adopted a two-step inquiry to determine the effect of pretrial publicity: (1) did the publicity create a presumption of prejudice, and (2) has the defendant shown actual prejudice? *See State v. Murray,* 184 Ariz. 9, 26, 906 P.2d 542, 559 (1995). If "a defendant can show pretrial publicity so outrageous that it promises to turn the trial into a mockery of justice or a mere formality, prejudice will be presumed without examining the publicity's actual influence on the jury." *State v. Bible,* 175 Ariz. 549, 563, 858 P.2d 1152, 1166 (1993). The defendant's burden of proof is "extremely heavy," and juror exposure to information concerning the trial does not raise a presumption that the defendant was denied a fair trial. *See id.* at 564, 858 P.2d at 1167; *see also Nebraska Press Ass'n v. Stuart,* 427 U.S. 539, 554, 96 S.Ct. 2791, 2800 (1976) (stating that courts rarely presume prejudice

due to outrageous pretrial publicity). We evaluate the totality of the circumstances from the entire record to determine if the publicity was so great as to result in an unfair trial. *See Bible,* 175 Ariz. at 565, 858 P.2d at 1168. Here, the facts do not require reversal.

¶ 45 By the time Jones presented his motion to change venue, more than 850 print or television articles addressed the murders and subsequent investigation. Although the trial court recognized the large amount of coverage, it noted that that fact alone was insufficient to require a venue change. Only a few of the articles mentioned Jones directly. Furthermore, the majority of the statements concerned largely factual contentions. *See Bible,* 175 Ariz. at 564, 858 P.2d at 1167 (" 'Although the news coverage was extensive, it largely was factual in nature, summarizing the charges against the defendants and the alleged conduct that underlay the indictment.' " (quoting *United States v. Angiulo,* 897 F.2d 1169, 1181 (1st Cir.1990))). The trial judge also took the precautionary steps necessary to choose an impartial jury. Thus, no presumption of prejudice arose.

¶ 46 Additionally, Jones has failed to prove any actual prejudice. At the outset of the voir dire, both parties stipulated to the removal of thirty venire persons, some of whom answered the written questionnaire and indicated that their feelings about the case, formulated through the media coverage, could not be changed. Importantly, almost all of the jurors who did have exposure to the publicity stated that their exposure was negligible, and every juror who admitted he could not set aside his feelings concerning the media coverage eventually was excused. Under the totality of the circumstances of the case, the media coverage alone was not so great as to create a presumption of prejudice, and defendant has failed to present evidence of any actual prejudice in this case. For these reasons, Jones's sixth point of error is denied.

G.

▇▇▇▇ ¶ 47 Jones next argues that the introduction of the police artist's composite

sketch constituted an impermissible introduction of hearsay evidence. Evidentiary rulings are subject to the trial court's determination and will not be disturbed, absent an abuse of discretion. *See Wait v. City of Scottsdale,* 127 Ariz. 107, 109–10, 618 P.2d 601, 603–04 (1980). During the trial, Mark Naiman testified that during the course of the Moon Smoke Shop robbery he had an opportunity to see one of the gunmen and later gave a police artist a description for a police sketch. The state offered the police sketch into evidence. The defense objected to foundation, arguing that the only person who could provide the proper foundation would be the individual who actually made the sketch. The court, however, admitted the sketch, stating, "[I]t appears that it would be the same as if it were a photograph. It doesn't matter how the depiction was created as long as this witness can state it is an accurate depiction of what he observed and that seems to be his testimony." (R.T. 6/18/98, at 72.)

¶ 48 Arizona Rule of Evidence 901(b)(1) allows a witness to authenticate a document, provided only that the individual have knowledge and "[testify] that a matter is what it is claimed to be." In this case, Naiman possessed such knowledge. He gave the artist the original description and he was in the best position to determine whether the drawing represented that description because he was present at both the robbery and the police interview. The trial court did not abuse its discretion in admitting the sketch under Rule 901.

### H.

¶ 49 Jones's eighth point of error concerns his attorney's waiver at a pretrial hearing of Jones's right to be present at all stages of the trial. Jones requested that he be allowed to participate in all bench conferences, and the court agreed, allowing him to listen to bench conferences through headphones. On day four of the trial, the court held a conference before trial began, during which the defense counsel waived Jones's right to attend. In the course of the hearing, the defense released two witnesses from trial.

¶ 50 A defendant's right to be present during trial stems from the Confrontation Clause of the Sixth Amendment. The right to be present at all critical stages of a criminal trial is a fundamental right. *See Rushen v. Spain,* 464 U.S. 114, 117, 104 S.Ct. 453, 455, 78 L.Ed.2d 267 (1983). Arizona has recognized, however, that the right may be waived. *See State v. Armenta,* 112 Ariz. 352, 353–54, 541 P.2d 1154, 1155–56 (1975). Jones argues, citing a number of cases from the federal circuit courts and this Court, that a defendant's right to be present may not be waived by his attorney, absent a showing that the defendant was aware he had the right to attend and was told the proceeding would go forward in his absence. *See, e.g., State v. Perez,* 115 Ariz. 30, 31, 563 P.2d 285, 286 (1977). Jones argues that because he had no notice of this particular hearing, and because his attorney released a witness without an opportunity for cross-examination, his constitutional rights have been violated.

¶ 51 Although a defendant has the right to be present at trial, his right extends only to those situations in which his "'presence has a relation, reasonably substantial, to the fullness of his opportunity to defend against the charge.'" *State v. Levato,* 186 Ariz. 441, 443, 924 P.2d 445, 447 (1996)(quoting *Snyder v. Massachusetts,* 291 U.S. 97, 105–06, 54 S.Ct. 330, 332, 78 L.Ed. 674 (1934)). Counsel may, however, "acting alone make decisions of strategy pertaining to the conduct of the trial." *Id.* at 444, 924 P.2d at 448. Criminal defendants are often bound by their counsel's strategy decisions. Here, Jones was not excluded from a proceeding that involved any actual confrontation. The jury was not present, and the trial judge did not make any determination concerning Jones himself. The defense lawyer made a strategy decision only. For these reasons, the trial court did not err in holding the proceeding outside his presence, and Jones's eighth point of error is denied.

### I.

¶ 52 Jones next argues that Arizona's death-qualification scheme violates both the Federal and State Constitutions. Although

we have upheld the practice of juror death-qualification, Jones asks this Court to reconsider its position. Jones argues three points: (1) because jurors' opinions are frequently religious-based, questioning them on this issue violates article II, section 12 of the Arizona Constitution, (2) death-qualification is unnecessary because Arizona juries do not sentence defendants, and (3) the death-qualification process produces conviction-prone jurors. We have already addressed and rejected those arguments.

¶ 53 First, Jones argues that questioning a venire person about whether his religious beliefs prevent him from being fair and impartial violates the constitution. We specifically rejected this argument in *State v. West,* 176 Ariz. 432, 440, 862 P.2d 192, 200 (1993), *overruled on other grounds by State v. Rodriguez,* 192 Ariz. 58, 961 P.2d 1006 (1998). Second, we have specifically approved death-qualification, despite the fact that judges sentence defendants. *See State v. La Grand,* 153 Ariz. 21, 33, 734 P.2d 563, 575 (1987) (holding that *Wainwright* was properly applied and met, despite the fact that judges determine sentence). Third, the Supreme Court rejected the argument that the process produces conviction-prone jurors. *See Lockhart v. McCree,* 476 U.S. 162, 168–73 & nn. 4 & 5, 106 S.Ct. 1758, 1762–65 & nn. 4 & 5, 90 L.Ed.2d 137 (1986). Finally, we have recognized the longstanding acceptance of the death-qualification scheme. *See State v. Gulbrandson,* 184 Ariz. 46, 57, 906 P.2d 579, 590 (1995); *State v. Stokley,* 182 Ariz. 505, 514, 898 P.2d 454, 463 (1995); *State v. Schaaf,* 169 Ariz. 323, 331, 819 P.2d 909, 917 (1991). For these reasons, the defendant's ninth point of error is denied.

### III.

#### A.

¶ 54 In addition to the trial issues argued on appeal, Jones also raises sentencing issues. He first argues that the A.R.S. § 13–703.F.5 pecuniary gain factor is unconstitutional because it does not narrow its application from the many cases in which the death penalty is not available. To pass constitutional muster, sentencing schemes must narrow the class of persons to those for whom the sentence is justified. *See Zant v. Stephens,* 462 U.S. 862, 877, 103 S.Ct. 2733, 2742–43, 77 L.Ed.2d 235 (1983). Here, Jones argues that broadening the factor to include ordinary robberies does not set this case apart from those in which the death penalty is not available.

¶ 55 In *State v. Spencer,* 176 Ariz. 36, 43, 859 P.2d 146, 153 (1993), we rejected this argument and held that if the receipt or expectation of pecuniary value is a cause of, or a motive for the murder, the F.5 factor applies. That is not to say that all robberies suffice to invoke the factor. Instead, robbery must be a motive or cause of the murder, rather than just the result. *See, e.g., State v. Correll,* 148 Ariz. 468, 479, 715 P.2d 721, 732 (1986). Thus, under our interpretation of the F.5 factor, Jones's argument on the merits of the F.5 factor fails.

¶ 56 Furthermore, under independent review, we find Jones and his co-defendant clearly intended to rob and murder their victims. They murdered the individuals to facilitate the robberies and then escape punishment. In the first robbery, Jones himself shot unsuspecting victim Chip O'Dell in the back of the head as he entered the Moon Smoke Shop. A second victim was hunted down by Scott Nordstrom and shot while trying to escape. Jones also attempted to shoot the remaining witnesses, despite the lack of provocation. All of these factors indicate that both Jones and Nordstrom began the robbery intending to murder anyone who happened to be in the store at the time. Likewise, in the second robbery, the victims were shot execution style, although none attempted to challenge the defendants. These murders were not "robberies gone bad." Instead, Jones and his co-defendant set out to accomplish the results they obtained, simply to acquire the money. Thus, the F.5 factor applies and has been proven beyond a reasonable doubt.

#### B.

¶ 57 Jones's final point of error involving sentencing concerns the trial court's finding that the A.R.S. § 13–703.F.7 aggrava-

ting factor was proven beyond a reasonable doubt. Section 13–703.F.7 provides that when a "defendant committed the offense while in the custody of or on authorized or unauthorized release from the state department of corrections, a law enforcement agency or a county or city jail," that fact may be considered an aggravating factor in the capital case. Here, Jones argues that the factor was not proven beyond a reasonable doubt because the only evidence presented was testimony from his parole officer, Ron Kirby, that Jones was, in fact, on parole at the time of the murders. Jones asserts that these statements, standing alone, do not meet the burden of proof beyond a reasonable doubt.

¶ 58 During the mitigation hearing, however, Jones failed to object to the testimony, to cross-examine the witness, or to challenge the evidence. Furthermore, in the pre-sentencing mitigation memorandum submitted by the defense to the trial court, Jones failed to address this issue at all. Instead, he now raises it for the first time on appeal. In the absence of contravention, the testimony alone provides sufficient grounds for the trial court's determination. The parole officer knew whether Jones was, in fact, on parole at the time, and the statute requires nothing more. Based on the testimony of the parole officer, we find that the F.7 factor has been proven beyond a reasonable doubt.

## IV.

¶ 59 Jones contends that the trial court erred when it imposed the death penalty. We independently review both the aggravating and mitigating factors pursuant to A.R.S. § 13–703.01 and *State v. Wood*, 180 Ariz. 53, 68, 881 P.2d 1158, 1173 (1994). For the following reasons, we uphold the trial court's sentence.

### A.

¶ 60 In addition to the A.R.S. § 13–703.F.5 and F.7 factors discussed above, the trial court found the existence of the aggravating factors F.1 (the defendant has been convicted of another offense for which a sentence of life imprisonment or death is imposable), F.2 (the defendant was previously convicted of a serious offense), and F.8 (the defendant has been convicted of one other homicide).

¶ 61 First, the trial court held Jones had been convicted of another offense for which life imprisonment or death is imposable. *See* A.R.S. § 13–703.F.1. The state proved this factor beyond a reasonable doubt because "each of the murders at the Moon Smoke Shop on May 30th, 1996, [and] each of the murders at the Fire [F]ighters' Hall on June 13th, 1996 satisfies this factor." (R.T. 12/7/98, at 18.) The court found the murders in the Fire Fighters Union Hall provided a sufficient basis to satisfy the F.1 factor for the murders in the Moon Smoke Shop. Likewise, the murders in the Moon Smoke Shop provided a sufficient basis for finding the factor for the murders in the Fire Fighters Union Hall. Although Jones argued at trial that the F.1 factor was not met because all six of the murders occurred in a single incident and the constraints of *State v. Walden*, 183 Ariz. 595, 905 P.2d 974 (1995) no longer apply, the trial court correctly determined that the F.1 factor had been met.

¶ 62 In *State v. Rogovich*, 188 Ariz. 38, 44, 932 P.2d 794, 800 (1997), we held that three different murders in the same killing spree satisfied the F.1 factor. In that case, the defendant was convicted of four counts of first-degree murder arising from two separate incidents. *See id.* He killed one individual at a convenience store in the morning, and killed three more later the same afternoon in a trailer park. We upheld the judge's determination that the three afternoon killings supported the F.1 factor. *See id.; see also State v. Lee*, 189 Ariz. 590, 604, 944 P.2d 1204, 1218 (1997) (holding " 'convictions entered prior to a sentencing hearing may . . . be considered regardless of the order in which underlying crimes occurred or the order in which the convictions were entered.' . . . For [F.1] purposes, . . . conviction occurs upon determination of guilt." (quoting *State v. Gretzler*, 135 Ariz. 42, 57 n. 2, 659 P.2d 1, 16 n. 2 (1983)) (citations omitted)).

¶ 63 In this case, the jury determined that Jones was guilty of first-degree murder on six different counts. These murders included the two killings at the Moon Smoke Shop,

and four killings at the Fire Fighters Union Hall. Under the statutory language of A.R.S. § 13–703.F.1, the trial court determines whether the defendant has a prior conviction of a crime that warrants the imposition of a life sentence. Because Jones was convicted for all six murders prior to sentencing, and because each set of murders provides a sufficient basis for finding the factor as to the other set of murders, we find the F.1 factor proven beyond a reasonable doubt.

¶ 64 Second, the trial court found that Jones's convictions on three counts of aggravated assault, three counts of armed robbery, and two counts of first-degree burglary satisfied the F.2 factor. Because Jones was convicted of these serious offenses before the sentencing phase, each offense provides sufficient grounds for satisfying the F.2 factors for the murder offenses. See *State v. Rogovich*, 188 Ariz. 38, 44, 932 P.2d 794, 800 (1997). The court was careful not to double count the murder offenses from the F.1 factor to satisfy F.2, stating, "Since the court has already considered the first-degree murder convictions in its 13–703(F)(1) analysis, those convictions will not be again considered in the determination of this factor." (R.O.A. at 858). The court properly determined that the non-capital offenses satisfied the F.2 factor beyond a reasonable doubt.

¶ 65 The trial court next found beyond a reasonable doubt that Jones committed multiple murders in the same crime. See A.R.S. § 13–703.F.8. The court held that both of the Moon Smoke Shop murders provided a sufficient basis for finding the F.8 factor for the other one, and that each of the Fire Fighters Union Hall murders provided a sufficient basis for finding the factor for each other. However, because this finding essentially counts the same murders previously counted in the F.1 analysis, we find the trial court erred. See *State v. Styers*, 177 Ariz. 104, 116, 865 P.2d 765, 777 (1993) (noting that the trial court may not consider the same fact to satisfy different aggravating factors). Although it is mathematically possible to satisfy both the F.1 and F.8 factors in this case without ever counting a single murder twice, we cannot determine from the record whether the trial judge actually did

so. We find, however, that even if the trial judge did double count the murders under the F.1 and F.8 factors, on this record, the error is harmless.

¶ 66 First, either the F.1 or F.8 factor, once combined with the F.2, F.5, and F.7 factors, outweighs the mitigating factors for sentencing, regardless of whether the other is applied. Second, as we have noted, it is possible to mathematically apply the murders to satisfy both the F.1 and F.8 factors without double counting any single murder. The clear facts show that Jones committed four of the six murders, and aided in the other two. For these reasons, we find that even if the trial court improperly double-counted the murders for purposes of finding the F.8 factor, any error was harmless.

## B.

¶ 67 Although Jones did not raise any issues regarding mitigating factors on appeal, we review them independently here. The defendant must prove the mitigating factors in A.R.S. § 13–703 by a preponderance of the evidence. See *State v. Laird*, 186 Ariz. 203, 207–08, 920 P.2d 769, 773–74 (1996).

¶ 68 In his pre-sentence mitigation memorandum, Jones argued that he did not have the capacity to appreciate the wrongfulness of his conduct. See A.R.S. § 13–703.G.1. Although a defendant must prove that his ability to conform to the law was significantly impaired, see *State v. King*, 180 Ariz. 268, 288–89, 883 P.2d 1024, 1044–45 (1994), the impairment need not have been so severe that it constitutes a complete defense to the crime. See *State v. Richmond*, 114 Ariz. 186, 197, 560 P.2d 41, 52 (1976). In this case, Jones argued (1) that his continual drug use impaired his ability to appreciate the nature of his crimes, and (2) that his antisocial personality disorder did the same.

¶ 69 Voluntary intoxication may be considered a mitigating factor if it impairs the defendant's ability to comprehend the nature of his crimes. See *State v. Kiles*, 175 Ariz. 358, 374, 857 P.2d 1212, 1228 (1993). Furthermore, voluntary intoxication may be

a factor when the defendant has a long history of substance abuse. *See State v. Jones,* 185 Ariz. 471, 489, 917 P.2d 200, 218 (1996). Here, the evidence presented shows that Jones has used drugs since he was introduced to them in his early teens by his stepfather. Furthermore, Dr. Jill T. Caffrey, a neuropsychologist, found Jones had an amphetamine dependence. Yet, under the evidence presented at trial, Jones drank only a small amount of beer on the night of the Moon Smoke Shop murders, and nothing at all on the night of the Union Hall murders. Although Jones had a long history of drug dependence, this fact alone does not meet the statutory mitigation requirement when the defendant is not actually under the influence of drugs at the time of the killings. *See State v. Miles,* 186 Ariz. 10, 918 P.2d 1028 (1996) (holding that the defendant could not present evidence of drug abuse because there was no evidence that the he was under the influence at the time of the crime). Not only did Jones fail to present any evidence that he was under the influence at the time of the murders, but Dr. Caffrey even noted that Jones committed other crimes when he was not on drugs. The state said it best in its reply to the mitigation memorandum: "Robert Jones is not a murderer because of drugs—he is a murderer who has used drugs in the past." (R.O.A. at 791.) For these reasons, the trial court properly found that Jones did not prove his incapacity to understand his crimes.

¶ 70 Jones also claims his personality disorder prevented him from understanding his crime. An antisocial personality disorder, combined with other factors, may be a mitigating circumstance. *See State v. McMurtrey III,* 136 Ariz. 93, 102, 664 P.2d 637, 646 (1983). Dr. Caffrey's report concludes that Jones did, in fact, have such a disorder. The trial court, however, held that no evidence showed this factor was a major and contributing cause of Jones's actions. Character or personality disorders alone are not sufficient to constitute significant impairment. *See State v. Murray,* 184 Ariz. 9, 42, 906 P.2d 542, 575 (1995). The defendant must also show that he was substantially impaired. Here, Jones made no showing that his condition significantly impaired his

ability to understand the crimes. Furthermore, this Court has rejected the substantial impairment argument for defendants with more serious disorders than Jones. *See, e.g., State v. Laird,* 186 Ariz. 203, 208, 920 P.2d 769, 774 (1996) (rejecting the G.1 factor because, for a defendant with serious mental problems, he still understood the significance of his actions). For these reasons, the trial court properly found that Jones did not prove the G.1 factor by a preponderance of the evidence.

¶ 71 Jones next argued in his presentence mitigation memorandum that he had proved the G.3 factor, relatively minor participation, by a preponderance of the evidence. Jones argued that the primary evidence presented at trial came from David Nordstrom and Lana Irwin. David Nordstrom had an obvious motive to lie to protect himself and his brother. Lana Irwin was unreliable because she could not remember events clearly. For these reasons, Jones argued that it is possible he never actually pulled the trigger in any of the murders. Scott Nordstrom could have done them all and simply blamed them on Jones. The evidence, however, suggests otherwise. Testimony from the surviving witnesses at the Moon Smoke Shop indicated that the two suspects were shooting at different times in different places. Thus, Jones could not have been a "minor participant" as required under the language of G.3. Furthermore, the jury found the evidence sufficiently credible to convict Jones. In the absence of any evidence that Jones was not a full participant in the crimes, the trial court properly found that the G.3 factor had not been proven by a preponderance of the evidence.

**C.**

¶ 72 Finally, this Court independently re-weighs the trial court's findings concerning non-statutory mitigation factors, which also must be proven by a preponderance of the evidence.

¶ 73 The trial court held that although the defendant was able to relate to others in a socially acceptable way, given his

criminal history, lack of employment history, and Dr. Caffrey's report, Jones did not prove the good character factor. Jones presented testimony from two witnesses who stated that he was extremely polite. Testimony concerning good character, however, is not a mitigating factor when contradicted by evidence that the defendant has been involved in other crimes. *See State v. Gonzales*, 181 Ariz. 502, 515, 892 P.2d 838, 851 (1995). Here, Jones committed crimes as a juvenile, and has been in and out of prison for felony convictions since that time. In fact, he committed these murders while on parole for another offense. Thus, he did not prove the good character factor.

¶ 74 Jones next argued that he is the product of a dysfunctional family. A dysfunctional family history may be a mitigating factor if it has a relationship to or affects the defendant's behavior at the time of the crime. *See State v. Mann*, 188 Ariz. 220, 231, 934 P.2d 784, 795 (1997). Jones produced evidence that his parents were divorced when he was young and he had no contact with his father after he turned seven years old. His mother remarried twice and had children by each of these marriages. Both stepfathers, Eugene and Ronnie, were physically and emotionally abusive, as were Jones's mother and grandmother. Jones was introduced to drugs by his stepfather, Ronnie, when Jones was only fourteen years old. Ronnie also beat Jones, his mother, and his siblings on a regular basis, and threatened to kill them all. Ronnie kicked Jones out of the home, and Jones became homeless and dropped out of school. As a result, he began to use drugs almost continuously.

¶ 75 Even if these facts were proven, they do not necessarily constitute mitigating factors. The trial court noted that the defense also produced numerous pictures depicting him as a happy child in a normal household. Even more importantly, the court noted that no causal connection existed between the childhood abuse and the murders. A defendant is not entitled to mitigating weight in the absence of a nexus between his family history and his violent behavior. *See State v. Martinez*, 321 Ariz. Adv. Rep. 6, 14, 196 Ariz. 451, 465, 999 P.2d 795, 809

(2000). Jones argues that, at the very least, his treatment during childhood led him to spend most of his life under the influence of drugs. As already noted, however, no evidence showed that he was intoxicated at the time of the murders. Therefore, although this factor has been proven by a preponderance of the evidence, the trial court properly gave it no mitigating weight.

¶ 76 Jones next argued that his history of providing emotional and financial support to his mother and sister indicated he did good deeds before the murders. A great number of good deeds may be a mitigating circumstance. *See State v. Willoughby*, 181 Ariz. 530, 549, 892 P.2d 1319, 1338 (1995). The only evidence that Jones presented, however, was that once he grew big enough, he protected his sister and mother from beatings by Ronnie. His actions convinced his mother that she could leave Ronnie and fend for herself. The trial court recognized that these facts were "scant evidence" of good deeds, particularly in light of all the heinous crimes Jones committed. For these reasons, the trial court properly found that the factor had not been proven by a preponderance of the evidence.

¶ 77 Jones also presented affidavits from his mother and sister that indicate their love and support of him. Although close family ties may be mitigating, *see State v. Poland*, 144 Ariz. 388, 406–07, 698 P.2d 183, 201–02 (1985), general statements of support carry little weight. *See State v. Gulbrandson*, 184 Ariz. 46, 71, 906 P.2d 579, 604 (1995). The trial court found that while Jones's sister and mother love him and care for him, these facts did not mitigate the crimes. While in his mother's custody during parole, Jones continued to engage in criminal activity. Therefore, although Jones proved by a preponderance of the evidence that he has family support, the trial court properly found that the fact was only slightly mitigating.

¶ 78 Jones next argued that he showed good behavior during the course of the trial. Although this factor has rarely been considered mitigating, it may be assigned some value. *See State v. Spears*, 184

Ariz. 277, 294, 908 P.2d 1062, 1079 (1996). The court noted that Dr. Caffrey observed that Jones tended to minimize his involvement in activities and tried to make himself look good. It further noted that the trial would be the ideal place to bring out Jones's best behavior. Clearly, the dichotomy between Jones's in-court behavior and his out-of-court criminal activity supports the court's finding. For these reasons, the trial court properly found that the factor was not proven.

■ ¶ 79 Jones argued that those who know him well believe that he has "solid potential" for rehabilitation. If a defendant has potential to be rehabilitated, the court may consider the fact mitigating. *See State v. Murray,* 184 Ariz. 9, 40, 906 P.2d 542, 574 (1995). The trial court noted, however, that Dr. Caffrey's report indicated that Jones was marked with psychopathology and an inability to live in accordance with societal rules. Additionally, Jones has a history of criminal behavior. Therefore, the trial court properly held that the factor had not been proven.

■ ¶ 80 The majority of Jones's mitigation memorandum concerned his devotion to his family and their strong feelings for him. Family devotion may be a mitigating factor where the family would suffer considerably from the defendant's loss. *See State v. Spears,* 184 Ariz. 277, 294, 908 P.2d 1062, 1079 (1996). The trial court found that Jones proved this factor by a preponderance of the evidence. In light of the defendant's violent behavior, however, the trial court properly found that the factor did not provide any mitigation additional to that already accorded to the circumstance of family support.

■ ¶ 81 Finally, Jones argued that residual doubt remains. He asserted that the state's reliance on the testimony of David Nordstrom, David Evans, and Lana Irwin, all paid informants who received something of value for their testimony, should have convinced the trial court that residual doubt existed. The trial court regarded this argument as merely an extension of the attack on the credibility of these witnesses. The jury of twelve persons, however, found Jones guilty despite his attacks on the witnesses'

credibility. Although the trial judge considered the issue, in light of the totality of evidence presented at trial, the trial court properly found that the factor had not been proven by a preponderance of the evidence.

## V.

¶ 82 For the foregoing reasons, we affirm Jones's convictions and his sentences.

CONCURRING: THOMAS A. ZLAKET, Chief Justice, CHARLES E. JONES, Vice Chief Justice, STANLEY G. FELDMAN, Justice, FREDERICK J. MARTONE, Justice.