920 P.2d 769

**STATE of Arizona, Appellee,**

v.

**Kenneth Jeremy LAIRD, Appellant.**

No. CR–94–0137–AP.

Supreme Court of Arizona,
En Banc.

July 9, 1996.

Grant Woods, Attorney General by Paul J. McMurdie, Chief Counsel, Criminal Appeals Section, and Consuelo M. Ohanesian, Assistant Attorney General, Phoenix, for State.

Dean W. Trebesch, Maricopa County Public Defender by Garrett W. Simpson, Deputy Public Defender, Phoenix, for Kenneth Jeremy Laird.

## OPINION

MARTONE, Justice.

A jury convicted Kenneth Laird of first degree murder, one count of dangerous kidnapping, one count of dangerous burglary, one count of theft, four counts of forgery, and one count of robbery. The trial court sentenced him to death for the murder and to prison terms for the noncapital convictions. Appeal to this court is automatic. *See* Rules 26.15 and 31.2(b), Ariz.R.Crim.P.; A.R.S. § 13–4031.

### *FACTS*

Approximately two weeks before the murder of Wanda Starnes, Laird told some friends that he would be getting a blue Toyota 4x4 truck. He also told a friend's mother that he was going to get a truck, "if he had to kill for it." Tr. Dec. 16, 1993 at 40.

Around noon on September 2, 1992, Laird ran away from his mother's home in north Phoenix, and rode his bicycle to the victim's home in Tatum Ranch. Laird was familiar with the home because he and his stepfather had graded the yard just the month before.

Around 2:30 p.m., Anthony Sabatino, a neighbor, saw Laird standing at the victim's door. Sabatino asked if he could be of assistance. Laird said that he was working construction in the subdivision and that his car had broken down. Sabatino offered the use of his phone to check on a ride. After apparently dialing a number and getting no answer, Laird left. Sabatino saw Laird later that day, sitting on a pile of rocks in the subdivision. Around 5:30 p.m., another of the victim's neighbors, Deborah Gregor, saw Laird near the victim's home. She noticed him peering over a side fence into the victim's yard.

At 7:00 p.m., the victim began her 12–hour shift as a cardiac nurse. While she was gone, Laird broke into her home and called several friends between 7:36 p.m. and 9:00 p.m. He told one of them that he was moving to a home in Tatum Ranch. At 6:00 a.m. the next day, he called another friend and told her that he could not drive her to school that morning.

A subcontractor working in the subdivision saw the victim's truck pull into the garage at about 9:00 a.m. The witness believed she was returning home from work. This was the last time she was seen alive.

Laird attacked her as soon as she came in. The struggle was vicious. Laird's face and hands were cut and scraped. The victim's hands had defensive wounds on them. Laird ultimately hog-tied her, and put her in a bathroom with a reverse lock so that the door could be locked from the outside. He put clothes at the base of the bathroom door to muffle sound.

Laird strangled the victim sometime between her return from work and 5:45 a.m. the next morning, September 4, 1992. He dumped her body in the desert and covered it with vegetation. The police arrested him the next day while he was driving her truck. He took the police to her body.

### *ISSUES PRESENTED*

Laird raises the following issues:

#### A. Trial Issues

1. Did the trial court err in failing to sever count 9 from the murder trial?

2. Did the trial court err in failing to grant a mistrial?

## B. Sentencing Issues

1. Was the murder committed in an especially heinous, cruel, or depraved manner (A.R.S. § 13–703(F)(6))?

2. Is the mitigation sufficiently substantial to warrant leniency in light of the existing aggravation?

3. Is Arizona's death penalty statute constitutional?

## *TRIAL ISSUES*

### A. Failure to Sever

Laird moved to sever count 9, a robbery charge, before trial. He argues that the court's denial of his motion prejudiced him and deprived him of due process of law and his right to an impartial trial under the United States and Arizona constitutions.

On September 5, 1992, two days after the victim disappeared, Laird was driving her truck in north Phoenix. He got into a quarrel with youths in another vehicle and chased them at high speed. They ultimately pulled over to apologize. As the driver got out of his truck, Laird punched him, kicked him several times in the ribs, and stole his hat. Some neighbors called the police. Laird drove off, and about 1½ hours later returned to the scene of the fight. As Laird approached, a neighbor pointed at his Toyota. The police stopped Laird and, after discovering that the truck was the subject of a crime bulletin, arrested him.

■ Rule 13.4(c), Ariz.R.Crim.P., requires a defendant to renew a motion to sever at trial. Failure to do so results in waiver of the severance issue. *Id.; see also State v. Gonzales,* 181 Ariz. 502, 508, 892 P.2d 838, 844 (1995), cert. denied, —— U.S. ——, 116 S.Ct. 720, 133 L.Ed.2d 673 (1996). Laird failed to renew his severance motion during trial and has therefore waived this issue. We review for fundamental error only.

■ The state conceded at oral argument that the trial court erred in not severing count 9. And we agree that Rule 13.3(a), Ariz.R.Crim.P., offers no basis for joinder.

But the evidence in this case is so strong, and Laird's defense is so incredible, that we can say with certainty that he was not denied a fair trial by improper joinder. *See State v. Gendron,* 168 Ariz. 153, 155, 812 P.2d 626, 628 (1991).

Here is Laird's story. He denied killing the victim but admitted taking her truck. He claimed that on Thursday, September 3, 1992, he came upon the truck while he was riding a bike through the desert towards Cave Creek. He "smelled something," Tr. Dec. 16, 1994 at 112, and then saw the victim's dead body in a wash behind the truck. He got scared and rode his bike to a hill above the victim and her truck. After waiting two hours, he decided to take her truck. He rummaged through it and found her address. He said he was familiar with the address because he and his stepfather had graded her yard. He drove to the victim's home and decided to keep her truck and move in because "she didn't need it anymore." *Id.* at 124.

This story is too implausible to merit belief. It is also flatly contradicted by the evidence. Three witnesses placed Laird around the victim's home on the day before he supposedly found her in the desert. Phone records prove that calls were made from the victim's home to several of Laird's friends that night. These friends testified that Laird placed the calls. Another friend testified that he saw Laird throw bloody women's underwear, a bloody sleeping bag, some boards, and a few shirts into two trash dumpsters. The police later recovered some of these items and traced them back to the victim. The police found blood matching the victim's on a blind in Laird's home. After two of his friends asked why blood was running out of the tailgate of the truck, Laird told them that he had "killed a bitch." Tr. Dec. 16, 1993 at 25. Under these circumstances, we can say with confidence that the trial of the robbery count with the rest of the case was not fundamental error.

### B. Failure to Grant Mistrial

#### 1. Testimony Regarding Laird's Probationary Status

Laird argues that the trial court erred by not declaring a mistrial when two witnesses

referred to his probationary status and an earlier detention.

The testimony at issue is as follows:

**a. Direct of Karen Jennings—Laird's Adoptive Mother**

Q [Prosecutor]: So with that information did you take some further action with regard to his absence?

A [Karen Jennings]: I believe I called his Probation Officer—

[Defense Counsel]: Objection, judge. May we approach?

[Court]: Sustained.

[Defense Counsel]: I'd ask it be stricken, Judge?

[Court]: It's ordered. Motion is granted. It's ordered striking her last answer, and the Jury is admonished to disregard it. That answer is to play no part in your deliberations.

Tr. December 15, 1993 at 10.

**b. Direct of Paul Jennings—Laird's Stepfather**

Q [Prosecutor]: And would your son have been working with you let's say in August of 1992?

A [Paul Jennings]: That I can't be sure of.

Q: July of '92?

A: He was being detained in Mesa—

[Defense Counsel]: Objection, Judge.

[Court]: Sustained.

[Defense Counsel]: I ask that it be stricken.

[Court]: His answer is stricken. The jury is admonished to disregard that answer.

*Id.* at 16.

■ In deciding whether a mistrial is warranted, we consider (1) whether the jury has heard what it should not hear, and (2) the probability that what it heard influenced them. *State v. Hallman,* 137 Ariz. 31, 37, 668 P.2d 874, 880 (1983). The state concedes that some of the unresponsive answers were improper. Laird never took the stand. Laird argues that the prejudicial impact of these answers was too great to be overcome by the court's admonition. We disagree.

■ These unsolicited responses came on the third day of a nine day trial in which fifty-one witnesses testified. They were a brief and tiny part of extensive trial testimony. The trial court acted promptly. In light of the significant amount of evidence implicating Laird, including his own admissions, we do not believe these responses could have added anything to the jury's consideration of the case. Striking the answers from the record and instructing the jury to disregard them were adequate.

**2. Testimony Regarding Transfer from Juvenile Court**

■ A police officer explained the juvenile *Miranda* rights form he read to Laird, including this language: "a juvenile judge may decide that you do not belong in juvenile court." Tr. Dec. 16, 1993 at 107–08. The trial court sustained Laird's objection, admonished the jury to disregard the testimony, and redacted the objectionable language. Laird failed to move for a mistrial but argues that the court should have declared one *sua sponte.* We disagree. *Sua sponte* mistrials can raise double jeopardy issues. *See, e.g., McLaughlin v. Fahringer,* 150 Ariz. 274, 277, 723 P.2d 92, 95 (1986). If a party wants a mistrial, it ordinarily must ask for one.

**3. Testimony Regarding Witness's Fear of Laird**

■ A witness who had seen Laird at the victim's home testified about a conversation he had with police detectives at a photographic lineup. He said he told the police that he did not want his wife involved in the investigation because he feared that Laird might do something if he were to get out of jail. Laird failed to object to this testimony. He argues it was fundamental error. We disagree.

*SENTENCING ISSUES*

■ Under A.R.S. § 13–703(C), the state has the burden of proving the existence of the aggravating circumstances contained in § 13–703(F) beyond a reasonable doubt. *State v. Spencer,* 176 Ariz. 36, 42, 859 P.2d 146, 152 (1993), *cert. denied,* 510 U.S. 1050, 114 S.Ct. 705, 126 L.Ed.2d 671 (1994). The defendant has the burden of proving the

existence of any mitigating circumstances by a preponderance of the evidence. *Id.*; A.R.S. § 13–703(C). We independently review the facts that establish the presence or absence of aggravating and mitigating circumstances and the propriety of the death sentence. A.R.S. § 13–703.01(A); *see also State v. Richmond,* 114 Ariz. 186, 196, 560 P.2d 41, 51 (1976).

## A. Aggravation

### 1. Heinous, Cruel, or Depraved— § 13–703(F)(6)

Laird argues that the trial court's finding that the murder was committed in an especially heinous, cruel, or depraved manner is not supported by the evidence. We disagree.

■ Because the words "especially heinous, cruel, or depraved" are stated in the disjunctive, the existence of any of the three elements is sufficient to constitute the § 13–703(F)(6) aggravating factor. *State v. Apelt (Michael),* 176 Ariz. 349, 368, 861 P.2d 634, 653 (1993), *cert. denied,* — U.S. —, 115 S.Ct. 113, 115 S.Ct. 113 (1994). We focus, as the trial court did, on the cruelty element.

■ Laird's attack was violent. Laird's mother testified that she did not notice any cuts or scratches on his face on the day before the crime. But three of Laird's friends testified that, on the next day, his face and hands were full of scratches and bite marks, and his lips and knuckles were swollen. The scene of the struggle was a mess. A potted plant was dumped over; dirt was everywhere. Yellow fibers and other debris were all over the floor. There were knife holes and gouges in the walls.

Laird overpowered the victim and locked her in the bathroom. He hog-tied her with a yellow cord and gagged her with a sock. He reversed the lock on the bathroom door and put towels under it. Laird's blood was on the victim's bed. Laird murdered her by tightening a noose around her neck like a tourniquet. He twisted the noose with a screwdriver. She was alive when he strangled her.

It is obvious that she suffered great physical and emotional pain, and thus the murder was "especially cruel." *See State v. Walton,* 159 Ariz. 571, 586, 769 P.2d 1017, 1032 (1989)(cruelty can consist of physical abuse or mental anguish, including victim's uncertainty as to her ultimate fate), *aff'd,* 497 U.S. 639, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990). This factor was proven beyond a reasonable doubt.

### 2. Pecuniary Gain— § 13–703(F)(5)

■ The trial court also found that the crime was committed for pecuniary gain. A.R.S. § 13–703(F)(5). Laird does not challenge this finding. We agree with the trial court that this aggravating factor exists beyond a reasonable doubt.

## B. Mitigation

Laird argues that the court erred in not finding diminished capacity under A.R.S. § 13–703(G)(1), in not finding any non-statutory mitigation, and in not giving sufficient mitigating weight to his age.

### 1. Capacity to Appreciate Wrongfulness of Conduct—A.R.S. § 13–703(G)(1)

■ Laird argues that his capacity to appreciate the wrongfulness of his conduct or conform his behavior to the requirements of law was significantly impaired by his mental disorders. *See* A.R.S. § 13–703(G)(1). We do not doubt that Laird suffers from serious personality disorders. Indeed, two psychologists concluded that he showed features of anti-social, narcissistic, and borderline personality disorders. But the evidence shows that he understood the significance of his actions. He planned the murder in advance. He dumped the victim's body in the desert, concealed it with vegetation, washed the victim's blood off the truck, disposed of bloody clothing in two separate trash dumpsters, and concocted a story about how he got the truck. The facts demonstrate that Laird understood the wrongfulness of his conduct. *See State v. King,* 180 Ariz. 268, 282, 883 P.2d 1024, 1038 (1994)("defendant's wiping down of security guard's holster demonstrates defendant knew enough to try to cover up his acts"), *cert. denied,* — U.S. —, 116 S.Ct. 215, 133 L.Ed.2d 146 (1995).

Nor is there evidence that Laird was drunk at the time of the murder. The neighbors who saw him the day before the murder did not note any signs of intoxication. When he called his friends that night and the next morning, there was no mention of intoxication. Laird said he had one sip of beer at the victim's house and did not like it.

## 2. Non–Statutory Mitigation

■ Laird argues that the trial court erred in not finding any non-statutory mitigation. Laird presented evidence that he was adopted, molested at an early age, had educational and behavioral difficulties in school, took Ritalin for hyperactivity, and abused substances. The court considered this evidence and found Laird had failed to connect his history and background to the murder. We agree. And even if we were to find this evidence to be non-statutory mitigation, it is not substantial enough to call for leniency.

## 3. Age of Defendant— § 13–703(G)(5)

■ The age of a defendant at the time of the murder can be a substantial and relevant mitigating circumstance. *State v. Jackson,* 186 Ariz. 20, 30–31, 918 P.2d 1038, 1048–49 (1996). In addition to raw age, we consider the defendant's level of intelligence, maturity, participation in the murder, and past experience. *Id.* Laird was 17–years and 5–months old when he committed the murder. We agree with the trial court that his age is a statutory mitigating circumstance. *See* A.R.S. § 13–703(G)(5).

Next, we consider Laird's intelligence. His psychological tests revealed low average intelligence (IQ of 89). He is capable of understanding and communicating but has difficulty with academic material. He may suffer from attention deficit disorder and hyperactivity.

We also consider Laird's maturity in light of his family background, impulsivity, and judgment. Laird's parents adopted him at infancy. At the mitigation hearing, Laird said he loved his family. They had been supportive and never violent. Although an older stepbrother molested Laird at age 10, his parents removed the stepbrother from the home, and Laird attended counseling. Except for this incident, Laird's family background was apparently ordinary.

Laird's psychological evaluations indicate that he suffers from an anti-social personality and narcissism. One psychologist described Laird as violent and sadistic. That is, he derives pleasure from inflicting harm and wielding power over others. In addition, he acts impulsively and lacks judgment.

■ An expert's description of a person as immature, impulsive, and without judgment will carry little weight where the circumstances of the crime show otherwise. *See, e.g., Jackson,* 186 Ariz. at 31–32, 918 P.2d at 1049–50 (claim that defendant was immature and killed impulsively was refuted by his extensive participation in the crime and the deliberate nature of the murder); *State v. Bible,* 175 Ariz. 549, 606, 858 P.2d 1152, 1209 (1993)(defendant must show causal connection between the alleged mitigation (difficult family history) and the murder), *cert. denied,* —— U.S. ——, 114 S.Ct. 1578, 128 L.Ed.2d 221 (1994).

Laird's crime does not show immaturity or impulsivity. He was the only participant in the murder. Two weeks before he killed her, he told friends that he was going to get a Toyota 4x4, even if he had to kill for it. Neighbors saw Laird stalking her the day before she disappeared. That night, he broke into her home, reversed the lock on the bathroom door, and waited until morning to ambush her. He tied her up, locked her in the bathroom, and strangled her. He dumped her body in the desert and concealed it with vegetation. He showed deliberation and an ability to delay gratification. *See State v. Walton,* 159 Ariz. 571, 589, 769 P.2d 1017, 1035 (1989)(carrying out plan over significant period of time reflects delay of gratification and maturity), *aff'd,* 497 U.S. 639, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990).

Finally, we consider Laird's past experience. Laird had no criminal record before 1992. But he broke into a home that year and stole some valuables and a car. He was convicted of two counts of theft and three counts of trafficking in stolen property. He

committed the present offenses a few months later.

We have independently reviewed the facts that establish aggravation and mitigation and agree with the trial judge that neither Laird's age nor other mitigating factors are sufficiently substantial to call for leniency.

## C. Constitutionality of Arizona's Death Penalty Statute

Laird's arguments that the death penalty statute is unconstitutional are foreclosed by prior decisions of the United States Supreme Court and this court.

1. The Supreme Court rejected the argument that the *Gretzler* factors fail to narrow the class of persons subject to the death penalty in *Lewis v. Jeffers*, 497 U.S. 764, 776–78, 110 S.Ct. 3092, 3099–3101, 111 L.Ed.2d 606 (1990). Moreover, Laird's death sentence is based upon the cruelty element of § 13–703(F)(6), not the heinousness or depravity element.

2. We rejected the argument that Arizona's death penalty statute fails to adequately narrow the class of eligible persons in *State v. Greenway*, 170 Ariz. 155, 164, 823 P.2d 22, 31 (1991).

3. The Supreme Court rejected the argument that Arizona's aggravating circumstances are not narrowly defined in *Walton v. Arizona*, 497 U.S. 639, 652–56, 110 S.Ct. 3047, 3056–58, 111 L.Ed.2d 511 (1990).

4. We rejected the argument that death by lethal injection is cruel and unusual punishment under the United States and Arizona constitutions in *State v. Hinchey*, 181 Ariz. 307, 315, 890 P.2d 602, 610 (1995), *cert. denied*, —— U.S. ——, 116 S.Ct. 528, 133 L.Ed.2d 434 (1995).

5. We rejected the argument that proportionality review is constitutionally required in *State v. Salazar*, 173 Ariz. 399, 416, 844 P.2d 566, 574 (1992), *cert. denied*, 509 U.S. 912, 113 S.Ct. 3017, 125 L.Ed.2d 707 (1994). We decline Laird's invitation to reinstate proportionality review where the defendant is a juvenile.

6. We rejected the argument that it is unconstitutional to sentence a juvenile to death under the United States and Arizona constitutions in *State v. Jackson*, 186 Ariz. 20, 24–25, 918 P.2d 1038, 1042–43 (1996).

## DISPOSITION

We reviewed the record for fundamental error and found none before we decided *State v. Smith*, 184 Ariz. 456, 460, 910 P.2d 1, 5 (1996)(holding that the repeal of A.R.S. § 13–4035 is procedural and not substantive and therefore fully retroactive). For the foregoing reasons, we affirm Laird's convictions and sentences.

FELDMAN, C.J., ZLAKET, V.C.J., and MOELLER and JONES, JJ., concur.