NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

STATE OF ARIZONA, *Appellee,*

*v.*

JORDAN DONALD BILLUPS, *Appellant.*

No. CA-CR 16-0429
FILED 7-18-2017

Appeal from the Superior Court in Maricopa County
No. CR2012-006726-001 DT
The Honorable John R. Ditsworth, Judge

**AFFIRMED**

COUNSEL

Arizona Attorney General's Office, Phoenix
By Jason Lewis
*Counsel for Appellee*

Maricopa County Public Defender's Office, Phoenix
By Nicholaus Podsiadlik
*Counsel for Appellant*

---

## MEMORANDUM DECISION

Presiding Judge Lawrence F. Winthrop delivered the decision of the Court, in which Judge Kenton D. Jones and Judge Patricia K. Norris[1] joined.

---

**W I N T H R O P**, Presiding Judge:

¶1        Jordan Billups ("Appellant") appeals his sentences and convictions for one count of sale or transportation of narcotic drugs and two counts of misconduct involving weapons.  Appellant argues the trial judge's bias prevented him from receiving a fair trial.  Appellant also contends the trial court improperly aggravated his sentence and abused its discretion in denying his motion for mistrial.  For the following reasons, we affirm.

### FACTS AND PROCEDURAL HISTORY[2]

¶2        In 2012, Appellant was indicted for one count of sale or transportation of narcotic drugs, a class two felony, and two counts of misconduct involving weapons, both class four felonies.  Pursuant to Arizona Revised Statutes ("A.R.S.") sections 13-701 (Supp. 2016), -703 (Supp. 2016), and -704 (Supp. 2016), the State gave notice of multiple aggravating circumstances and filed allegations of prior felony convictions and historical priors.

¶3        At trial, Agent Brendan Iver of the Bureau of Alcohol, Tobacco, Firearms, and Explosives testified on behalf of the State.  Iver testified that, while working undercover, he leased a store front in a strip mall in an area that had been "identified as a problem area."  The store, set

---

[1]        The Honorable Patricia K. Norris, Retired Judge of the Court of Appeals, Division One, has been authorized to sit in this matter pursuant to Article 6, Section 3, of the Arizona Constitution.

[2]        We view the evidence in the light most favorable to upholding the jury's verdict. *State v. Moody*, 208 Ariz. 424, 435 n.1, 94 P.3d 1119, 1130 n.1 (2004).

up as a pawn shop, was open to the public and "was run like your regular business."

¶4        On July 15, 2010, Appellant, a tattoo artist, entered the store and spoke to Iver about his availability to provide tattoo services. As the conversation progressed, Appellant "handed [Iver] a little latex baggie with five oxycodone pills inside of it." Appellant and Iver "agreed on a price of $225 for the five pills" and Iver paid Appellant. At some point during the transaction, Appellant informed Iver that he "had a friend that had a shotgun,"[3] and Iver indicated that he would "take a look" if Appellant "wanted to bring it by." Appellant then left the store.

¶5        On August 12, 2010, Appellant returned to the store with a friend who was carrying a shotgun wrapped in a towel. Appellant stated that his friend was carrying the shotgun because "[Appellant] was a felon so he [could not] carry the firearm himself." Iver and Appellant agreed on a price for the shotgun,[4] Iver gave Appellant the money, and Appellant left the store.

¶6        On August 25, 2010, Appellant again arrived at the store with a woman and a child "that [Appellant] had stated was his daughter." The woman carried a shotgun into the store and set it down behind the counter. Appellant and Iver agreed on a price, Iver paid Appellant, and Appellant left the store with the woman and his daughter. Appellant was later arrested and indicted on the above-described charges.

¶7        In addition to Iver's testimony, the State played audio and video recordings depicting the transactions that took place between Iver and Appellant on July 15, August 12, and August 25. The State also presented testimony from several other witnesses, including forensic chemist Shana Middleton, who stated that she had tested the pills Appellant sold to Iver on July 15, and had identified them as oxycodone.

---

[3]      Iver testified that Appellant later told him the shotgun was his and that "[h]e needed it for home protection." At sentencing, defense counsel indicated that the gun belonged to someone else who "owed [Appellant] money for [a] tattoo."

[4]      Iver gave Appellant $250 that day, with the understanding that Appellant would later provide tattoo services to Iver.

**¶8** The jury convicted Appellant on all charges.[5] The court sentenced Appellant to 16.75 years for the sale or transportation of narcotic drugs and 10 years for each count of misconduct involving weapons, with all three sentences to run concurrently. Appellant appealed, and we have jurisdiction pursuant to the Arizona Constitution, Article 6, Section 9, and A.R.S. §§ 12-120.21(A)(1) (2016), 13-4031 (2010), and 13-4033(A) (2010).[6]

## ANALYSIS

### I. Judicial Bias

**¶9** Appellant argues the trial judge's bias deprived him of the right to a fair trial and, despite his failure to object below, he is entitled to structural error review. *See State v. Valverde*, 220 Ariz. 582, 584-85, ¶ 10, 208 P.3d 233, 235-36 (2009) (stating that structural error "deprive[s] defendants of basic protections" and, if an appellate court finds such error, "reversal is mandated regardless of whether an objection is made below"). The State contends Appellant's allegations of bias do not amount to structural error implicating due process, and because Appellant did not object below, the appropriate standard of review on appeal is fundamental error. *See State v. Henderson*, 210 Ariz. 561, 564-65, ¶ 8, 115 P.3d 601, 604-05 (2005) (explaining that fundamental error review applies where no objection is made at trial). However, because we conclude Appellant has not shown bias necessary for reversal under either standard of review, we need not decide which standard of review applies in this case.

**¶10** "Bias and prejudice means a hostile feeling or spirit of ill-will, or undue friendship or favoritism" toward one of the parties. *State v. Myers*, 117 Ariz. 79, 86, 570 P.2d 1252, 1259 (1977). Generally, "the bias and

---

[5] At some point after the jury began to deliberate, Appellant left the courthouse. Appellant had still not returned when the jury later notified the court it had reached a verdict; consequently, the court requested the jury return the next morning to read its verdict and issued a bench warrant for Appellant's arrest. When Appellant did not appear the next day, the court found that Appellant had "voluntarily absented himself from the proceedings," and the clerk read and recorded the jury's verdicts in Appellant's absence.

[6] Appellant initially filed an untimely appeal, which this court dismissed. However, the trial court later granted Appellant's request to file a "delayed appeal."

prejudice necessary to disqualify a judge must arise from an extra-judicial source and not from what the judge has done in his participation in the case." *State v. Emanuel*, 159 Ariz. 464, 469, 768 P.2d 196, 201 (App. 1989) (citing *State v. Thompson*, 150 Ariz. 554, 557, 724 P.2d 1223, 1226 (1986)) (internal quotations omitted). "The fact that a judge may have a strong opinion on the merits of the cause or a strong feeling about the type of litigation involved, does not make the judge biased or prejudiced." *State v. Menard*, 135 Ariz. 385, 387, 661 P.2d at 649, 651 (App. 1982) (citing *Myers*, 117 Ariz. at 86, 570 P.2d at 1259).

¶11        Appellant asserts that the trial judge "exhibited a 'hostile feeling' toward [him]" during sentencing. Specifically, Appellant references a portion of the sentencing transcript during which the trial judge stated to Iver,

> And my only disagreement with that whole thing about this transaction was, it was a tattoo artist who was going to get payment, and the only thing the guy had to give him was the shotgun as I recall. Isn't that the way it went down?
>
> So [Appellant] knew he wasn't supposed to have [the gun] and I thought to some extent, he was doing—it was a dumb-ass way of doing it. If he hadn't shown up [at the pawn shop] and sent his wife, there, there wouldn't be a problem, would there? To some extent I think "dumb ass" should be engraved on his forehead.

But shortly thereafter, Iver stated, "[Appellant] is actually a likable guy," to which the judge responded, "Which is the sad part of all of this."

¶12        After a close review of the record, we cannot conclude the trial judge's remarks were anything more than an expression of his opinion about the admittedly ill-considered way in which Appellant executed the crimes for which he was charged. *See Liteky v. United States*, 510 U.S. 540, 555 (1994) ("[J]udicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge."). Although ill-

advised and inconsistent with the Arizona Code of Judicial Conduct,[7] the judge's remarks do not rise to the level of "deep-seated favoritism or antagonism" required to demonstrate bias. *See id.* at 555.

¶13    Appellant further contends that the trial judge's "comments regarding his long career as a prosecutor suggest that [the judge] viewed himself as a continuing advocate for the prosecution and against [Appellant]." The trial judge referenced his former career as a prosecutor once during jury selection and again during sentencing. During jury selection, when speaking to the jury about the importance of jury duty, the judge stated, "I have been called to jury duty eight times since I have become a judge. In 15 years that I was a prosecutor up here, I was never called." After sentencing Appellant, the judge stated,

> [T]hat sentence gets the defendant released at approximately the age of 50. In my mind, at the age of 64, looking at someone who is going to serve a 16-year sentence, I think it's an extraordinarily long amount of time. For someone his age, 35. It's a long amount of time.
>
> In my mind, however, that release date of 50 is what is important because when I was a gang and repeat offender prosecutor, I was taught religiously that people do change somewhere between 45 and 50.

¶14    As support for his argument, Appellant cites *Williams v. Pennsylvania*. In *Williams*, the U.S. Supreme Court held that a judge who had been a supervising prosecutor on a defendant's case could not later adjudicate an appeal of that defendant's death sentence. 136 S. Ct. 1899, 1905 (2016). Here, however, Appellant has presented no evidence that the trial judge "had significant, personal involvement as a prosecutor in a critical decision regarding [his] case," let alone any involvement at all. *See id.* at 1905. Additionally, the record indicates the judge's comment during jury selection about his former career as a prosecutor was nothing more than a passing remark intended to convey to the jurors the importance of

---

[7]    Rule 2.8(B) of the Arizona Code of Judicial Conduct (2009) provides that a judge "shall be patient, dignified, and courteous to litigants, jurors, witnesses, lawyers, court staff, court officials, and others with whom the judge deals in an official capacity . . . ."

jury duty. And, although the trial judge again referenced his former career as a prosecutor during Appellant's sentencing, earlier in the trial he had also mentioned that he had formerly worked as a public defender.[8] The reference during sentencing also appears to have been designed to explain the court's thinking and aspirations for Appellant when he completed his sentence. As such, the record does not support Appellant's argument that the trial judge was "psychologically wedded to his . . . previous position as a prosecutor." *See id.* at 1906 (internal quotations omitted).

¶15 Finally, Appellant claims the trial judge's decision to impose an aggravated sentence was an indication of bias. Generally, judicial rulings alone do not support a finding of bias without a showing of an extrajudicial source of bias. *See State v. Ellison*, 213 Ariz. 116, 129, ¶ 40, 140 P.3d 899, 912 (2006). In this case, Appellant contends the trial judge "literally adopted the prosecution's handbook" during sentencing and "rationalized the aggravated sentence" based on the training he had received as a former prosecutor. But the trial judge did not impose the State's recommended sentence of 18 years, instead imposing a shorter and only slightly aggravated sentence of 16.75 years.[9] Additionally, the sentencing transcript reveals that the judge based the imposition of an aggravated sentence on statutory aggravating factors that Appellant had admitted to, and on Appellant's failure to appear during a portion of the trial.

¶16 Accordingly, we find no support for Appellant's claims of judicial bias.

---

[8] While the jury was deliberating, the judge stated to counsel, "When I was a public defender we talked about admission of priors."

[9] The court determined that the presumptive sentence in this case for the sale or transportation of narcotic drugs was 15.75 years, and the presumptive sentence for each charge of misconduct involving weapons was 10 years.

*II.    Aggravation*

**¶17**         Appellant argues the trial court erred in improperly aggravating his sentence.  We find no error, fundamental or otherwise.[10]

**¶18**         A trial court may impose a sentence greater than the presumptive term if the defendant admits "the circumstances alleged to be in aggravation of the crime" or if the defendant admits or the court finds the defendant has a prior felony conviction.  A.R.S. § 13-701(C), (D).  Here, the parties stipulated that Appellant committed the offenses for the expectation of pecuniary gain.  *See* A.R.S. § 13-701(D)(6).  The court also found that Appellant had been convicted of four prior felony offenses.[11]  *See* A.R.S. § 13-701(D)(11).  The court therefore had discretion in this case to impose a sentence greater than the presumptive term.  A.R.S. § 13-701(C), (D).  In addition, once the court "set[s] forth on the record at sentencing" one of the aggravating factors enumerated in A.R.S. § 13-701(D)(1)-(23), it may rely on the "catch-all" aggravator in § 13-701(D)(24) to increase the sentence "even if the court does not expressly use the specific statutory aggravator as a basis for increasing the sentence."[12]  *See State v. Bonfiglio*, 231 Ariz. 371, 372, ¶ 1, 295 P.3d 948, 949 (2013).

**¶19**         Appellant maintains the trial court improperly sentenced him "based on [his] age of 35" and a "sentencing philosophy" the judge had learned as a former prosecutor.  But the trial court's comment that "people

_____

[10]     Both parties contend that, because Appellant failed to object below, the applicable standard of review on appeal is fundamental error.  *See Henderson*, 210 Ariz. at 564-65, ¶ 8, 115 P.3d at 604-05 (stating that fundamental error review applies where no objection is made at trial).  However, another panel of this court has held that a defendant does not forfeit his right to ordinary appellate review by failing to object where the trial court imposed sentence immediately after finding an aggravating factor.  *See State v. Vermuele*, 226 Ariz. 399, 402, ¶ 9, 249 P.3d 1099, 1102 (App. 2011).  Because we find no error, fundamental or otherwise, we need not decide whether Appellant forfeited his rights by not objecting below.

[11]     Appellant stipulated that he had previously been convicted of three felonies and "had not applied to have his right to be in possession of a firearm restored under Arizona law."

[12]     The "catch-all" aggravator is defined as "[a]ny other factor that the state alleges is relevant to the defendant's character or background or to the nature or circumstances of the crime."  A.R.S. § 13-701(D)(25).

do change somewhere between 45 and 50" was in reference to the court's consideration and hope that, because of a maturing process, Appellant would not reoffend on release, not as a justification for imposing a harsher sentence. Moreover, the court clearly stated on the record at sentencing that it was imposing the aggravated sentence based on Appellant's prior criminal history, Appellant's failure to appear during the aggravation phase of the trial, and the fact that the offenses were committed for "pecuniary gain." Accordingly, we find no support for Appellant's argument that the trial court erred in imposing an aggravated sentence.

### III.     Denial of Motion for Mistrial

**¶20**          Appellant argues the trial court erred in denying his motion for mistrial after Iver testified about "an uncharged crime, guns, drugs, violence, murder, and gangs." We review a trial court's denial of a motion for mistrial for a clear abuse of discretion. *State v. McCrimmon*, 187 Ariz. 169, 172, 927 P.2d 1298, 1301 (1996). We give great deference to the trial court's decision because that court "is in the best position to determine whether the evidence will actually affect the outcome of the trial." *State v. Jones*, 197 Ariz. 290, 304, ¶ 32, 4 P.3d 345, 359 (2000). "We will not reverse a conviction based on the erroneous admission of evidence without a 'reasonable probability' that the verdict would have been different had the evidence not been admitted." *State v. Hoskins*, 199 Ariz. 127, 142-43, ¶ 57, 14 P.3d 997, 1012-13 (2000) (citing *State v. Atwood*, 171 Ariz. 576, 639, 832 P.2d 593, 656 (1992)).

**¶21**          In determining whether unsolicited remarks made by a witness at trial are so improper as to require a mistrial, we consider (1) whether the jury has heard what it should not hear and (2) the probability that the jury was influenced by what it heard. *State v. Laird*, 186 Ariz. 203, 207, 920 P.2d 769, 773 (1996) (citing *State v. Hallman*, 137 Ariz. 31, 37, 668 P.2d 874, 880 (1983)).

**¶22**          Here, counsel apparently had an agreement that Appellant's alleged participation in a home invasion would not be brought up at trial. However, Iver mentioned home invasions twice during his testimony. First, when the State asked if Iver could "elaborate on some of the training [he] received, as far as doing undercover work," Iver responded that he had taken several courses related to undercover work, including a "two-week course where they dealt more with long-term undercover infiltrations" and a "two-week home invasion school, which was basically . . . charging and conducting undercover operations involving violent home invaders." Iver then went on to generally describe these types of home invasions, stating,

9

> Go in, kill the guys, tie them up, beat them up. You know, it varies all the time. It's in the newspapers as well, but going in there and ripping the drug loads or ripping the money, if they know where the money is, you know.

When Iver continued this narrative description, counsel for Appellant objected, and the trial court sustained the objection.

¶23 Later, with reference to the shotgun being offered for sale, the prosecutor asked Iver, "Did the defendant tell you that it was his firearm?" Iver answered the question by stating, "Yes. Yes." Iver then continued his response, without interruption or objection, and gave a lengthy narrative description of his transactions with Appellant, testifying that Appellant told him he "knew some individuals that were going to commit a home invasion." Defense counsel objected, and the court sustained the objection. Shortly thereafter, defense counsel requested a mistrial, stating the parties had agreed that Appellant's alleged participation in a home invasion would not be brought up. The State acknowledged the parties had made such an agreement, and offered to "clean this up very quickly" with a corrective question to Iver, so that Iver could clarify that he was not suggesting Appellant was involved in the home invasion he had mentioned. The court stated it did not believe the State had intentionally introduced the testimony, indicated it would allow the corrective question, and denied the motion for mistrial.[13] Defense counsel rejected the offer of a curative question, stating it would not help and "would just bring attention back to the issue of the home invasion."

¶24 The State concedes that Iver "briefly testified to a matter the jury should not have heard." The parties dispute, however, whether the Iver's testimony was so prejudicial as to warrant a mistrial. Appellant cites *State v. Cruz* as support for his argument that Iver's remarks were "particularly prejudicial in this case." However, the circumstances in *Cruz* were different. There, the appellant was tried with a co-defendant after the court denied multiple requests to sever his trial. *State v. Cruz*, 137 Ariz. 541, 543, 672 P.2d 470, 472 (1983). At trial, counsel for the co-defendant elicited from a witness potentially prejudicial testimony that would not have come

---

[13] The court also suggested that Appellant's counsel failed to timely object when Iver was testifying about "marginally relevant" topics.

out if the appellant had been tried separately.[14]  *Id.* at 546, 672 P.2d at 475. The supreme court concluded that, because the testimony would not have come out had the appellant and co-defendant been tried separately, "the trial judge should have either ordered a mistrial as to [the] appellant and severed him from [the co-defendant] . . . or taken sufficient measures to protect against the prejudice."  *Id.*

¶25        In this case, Iver's remarks on home invasions constituted only a brief part of a five-day trial, during which the State presented significant evidence, including video and audio footage, directly implicating Appellant in the charged offenses.  *See Laird*, 186 Ariz. at 207, 920 P.2d at 773 (holding that a mistrial was not warranted where, "[i]n light of the significant amount of evidence implicating [the defendant]," a witness' statements likely did not "add[] anything to the jury's consideration of the case").  Unlike the testimony in *Cruz*, which directly connected the appellant to certain crimes, the complained-of testimony by Iver in this case consisted of generalized statements about home invasions and an ambiguous reference to an unproven crime involving other individuals.  *See Jones*, 197 Ariz. at 305, ¶ 34, 4 P.3d at 360 (concluding the trial court did not abuse its discretion in denying a motion for mistrial where a witness made "relatively vague references to other unproven crimes and incarcerations").  Further, when defense counsel objected to Iver's testimony, the trial court sustained both objections.  The prosecutor offered and the court approved a curative question, which likely would have resolved any doubt on the part of the jury about Appellant's involvement in the alleged home invasion.  Although defense counsel rejected the curative question, the court later instructed the jury, "If the Court sustained an objection to an attorney's question, please disregard the question and any answer given."  Thus, although Iver's unsolicited narratives in this regard may have been improper, we cannot conclude the statements were so prejudicial as to influence the jury's decision in this case. *See State v. Celaya*, 135 Ariz. 248, 256, 660 P.2d 849, 857 (1983) ("A mistrial or reversal is warranted only if it appears reasonably possible that error might have materially influenced the jury.") (citing *State v. Grier*, 129 Ariz. 279, 630

---

[14]    The witness testified that "he had heard that [the] appellant had affiliations with organized crime, that he heard that [the] appellant had once hired two people from Chicago to kill him, . . . that [the] appellant had asked him . . . to break someone's legs, and that he . . . had arranged for someone to burn a building at [the] appellant's request."  *Id.* at 545-46, 672 P.2d at 474-75.

P.2d 575 (App. 1981)). Accordingly, the trial court did not abuse its discretion in denying Appellant's motion for mistrial.

## CONCLUSION

¶26 Appellant's sentences and convictions are affirmed.

