NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

STATE OF ARIZONA, *Appellee*,

*v.*

JUSTIN MILES ALLEE, *Appellant*.

No. 1 CA-CR 19-0223

FILED 5-21-2020

Appeal from the Superior Court in Maricopa County
No. CR2015-102339-001
The Honorable Erin O'Brien Otis, Judge (Retired)

**AFFIRMED**

COUNSEL

Arizona Attorney General's Office, Phoenix
By Jennifer L. Holder
*Counsel for Appellee*

Maricopa County Office of the Legal Advocate, Phoenix
By Andrew Charles Marcy
*Counsel for Appellant*

_____

**MEMORANDUM DECISION**

Judge Maria Elena Cruz delivered the decision of the Court, in which Presiding Judge Lawrence F. Winthrop and Judge David B. Gass joined.

_____

**C R U Z**, Judge:

¶1          Justin Miles Allee ("Allee") appeals his conviction and sentence for intentional child abuse against his minor child, Evangeline.[1] For the following reasons, we affirm.

## FACTUAL AND PROCEDURAL HISTORY

¶2          Evangeline was born to D.C. and Allee on December 1, 2014. During D.C.'s pregnancy, there were no health concerns. Evangeline was born soon after D.C. went into labor and before hospital staff was fully prepared for the delivery, causing her to be delivered while D.C. was lying on her side. Nevertheless, a nurse was able to deliver Evangeline, post-delivery testing showed that she was healthy, and she was discharged to go home the following day.

¶3          Four days after Evangeline's birth, a pediatrician conducted the first wellness check, analyzing Evangeline's weight, height, and head circumference, which were all normal. About a month later, Evangeline had her second wellness check. The pediatrician changed Evangeline's formula because D.C. reported that Evangeline was colicky and spitting up, which is common among newborns. The pediatrician again reported that Evangeline's measurements were normal, and she was otherwise healthy.

¶4          A few days after her second wellness check, Evangeline spit up blood. Allee asserted that Evangeline was okay and objected to seeking medical care for her. Over Allee's objection, D.C. took Evangeline to the hospital. An ultrasound revealed Evangeline had inflammation in her stomach as a result of acid reflux. Evangeline was prescribed an antacid and received samples of soy-based formula on the basis that she might have a lactose intolerance. The hospital pediatrician also completed a physical

_____

[1]          For ease of reference, we use the same pseudonym used by the parties to identify the victim, pursuant to Arizona Rule of Criminal Procedure 31.10(f).

examination of her and found nothing out of the ordinary.  Following the hospital visit, Evangeline's condition improved, and she did not spit up blood again.

¶5        On January 14, 2015, D.C. noticed that Allee was agitated. D.C. observed in the past that Allee would regularly get irritated with Evangeline's crying and put his headphones on.  Knowing this, D.C. would give Allee some "alone time" on occasion and did so on that day.  In the afternoon, D.C., Allee, and Evangeline visited with Allee's family. Evangeline was fed and took a nap.  Eventually, D.C. had to go to work and dropped Allee and Evangeline off at their home.

¶6        About two hours later, D.C. received a phone call from Allee. Allee told D.C. that Evangeline was having a hard time breathing and said that Evangeline was holding and releasing her breath, as she had done in the past when she was upset.  D.C. advised Allee that if he thought something was wrong, he should call 9-1-1.

¶7        Allee eventually called 9-1-1, and paramedics arrived within minutes.  Allee told them that Evangeline was just working herself up and crying to the point of not breathing.  The paramedics observed that Allee seemed disinterested in the situation and gave them plenty of space to examine Evangeline.  At one point, Allee even walked away when a paramedic was trying to get Evangeline's medical history.  Allee's behavior was later described as unusual for parents in such situations.  Generally, parents offer too much information and hover over the paramedics, resulting in them getting in the way.  When the paramedics examined Evangeline, they knew she needed urgent medical care because her heart and breathing rate were both abnormally low.  Evangeline was administered oxygen and, along with Allee, was transported to the hospital.

¶8        At the hospital, the social worker talked to Allee in the trauma bay, where Evangeline was being treated.  She observed that Allee was very calm and relaxed, playing games on his cell phone, and not paying much attention to what the doctors were doing.  When the social worker approached Allee to offer support and find out what happened, Allee became very defensive towards her.  Allee eventually told her that Evangeline woke up screaming and was having difficulty breathing, and that when he picked her up, she suddenly went limp and unconscious.

¶9        The doctors eventually found that Evangeline had significant trauma to her head: old and new subdural bleeds, brain tissue destroyed by

3

lack of blood flow, a torn frenulum, and retinal hemorrhages in each eye. Evangeline, however, did not suffer any external injuries to her head, such as a fracture, bruise, or swelling. She also did not have any soft tissue swelling. Based on all of this information—including that Evangeline's brain injuries were global and not localized in one area—the doctors concluded that Evangeline's injuries were the result of rapid acceleration-deceleration, most likely from shaking. And because Evangeline acted and ate normally that day, the doctors opined that she had suffered the injury sometime between her last feeding, which occurred moments before D.C. left for work, and Allee's 9-1-1 call.

¶10        Officers from the Phoenix Police Department contacted Allee at the hospital. Allee initially stuck by what he told the social worker earlier, namely that he picked Evangeline up and she just went limp. Officers subsequently arrested Allee and transported him to the police station for a second interview. After police confronted Allee with the fact that Evangeline's injuries were inconsistent with his version of events, Allee admitted that there had been an accident. He alleged that he accidently dropped Evangeline in the bathtub when he was trying to turn the faucet on to wet her feet to keep her awake so he could adjust her sleep cycle.

¶11        Based upon the injuries and doctor's opinions that Evangeline had been rapidly shaken, the State charged Allee with intentional child abuse, a Class 2 felony and dangerous crime against a child.

¶12        Allee's defense theory at trial was that Evangeline's injuries were caused by him accidentally dropping her. Therefore, Allee asserted he could not be guilty of intentional child abuse. Allee's two medical experts opined the injuries could have been caused as Allee described. One expert testified that the internal bleeding could have also been caused by pre-existing conditions related to Evangeline's delivery while D.C. was lying on her side. However, the experts also conceded the injuries could have been caused by rapid acceleration-deceleration movement. And the defense experts acknowledged that no objective evidence corroborated Allee's version of events. Finally, Allee's biomechanical-engineer expert also testified that Evangeline's injuries could have occurred from Allee dropping her from a height of between thirty and thirty-one inches. However, on cross-examination, he acknowledged that his experimental re-creation of the fall did not take into account Allee's inconsistent statements made during the videotaped second interview with police. After viewing Allee's interview and statements that Evangeline had fallen when he was standing back up after turning on the faucet, not as he was bending towards

4

it, this expert testified that information could have changed how he conducted the experiment that formed the basis of his expert opinion.

¶13       During the trial, the social worker testified she had observed D.C. had a bruised eye when Evangeline was brought to the hospital. Allee moved for a mistrial, arguing the jury would infer Allee caused the bruised eye. However, the social worker also testified that D.C. said the bruised eye was caused by a can falling from a shelf while D.C. was at work. The court denied the motion and struck the testimony on hearsay grounds.

¶14       Allee requested an instruction on the lesser-included offenses of reckless and criminally negligent child abuse. Finding that the evidence only supported a finding that Allee either intentionally shook Evangeline, or accidently dropped her, the court denied the request for lesser-included offense instructions. The jury convicted Allee of intentional child abuse. Allee timely appealed, and we have jurisdiction pursuant to Arizona Revised Statutes ("A.R.S.") sections 12-120.21(A)(1) and 13-4033(A)(1).

## DISCUSSSION

¶15       Allee challenges both the court's denial of lesser-included offense instructions and the court's denial of a mistrial based on the social worker's unsolicited testimony regarding D.C.'s bruised eye. Because the decisions to give a jury instruction and grant a mistrial are both left to the sound discretion of the superior court, we review for an abuse of discretion. *State v. Wall*, 212 Ariz. 1, 3, ¶ 12 (2006); *State v. Welch*, 236 Ariz. 308, 314, ¶ 20 (App. 2014).

I.       Lesser-Included Offense Instructions

¶16       Although Allee maintained the defense was "not arguing that he was careless or negligent or reckless," but that the alleged drop was inadvertent, Allee argues the court erred when it declined to instruct the jury on reckless or criminally negligent child abuse, lesser-included offenses of intentional child abuse.

¶17       Evidence to support a lesser-included offense instruction must meet two conditions. *Wall*, 212 Ariz. at 4, ¶ 18. "The jury must be able to find (a) that the State failed to prove an element of the greater offense and (b) that the evidence is sufficient to support a conviction on the lesser offense." *Id.* However, "[t]he law does not require or even permit" instructions on lesser-included offenses based on the possibility "that the jury might simply disbelieve the state's evidence on one element of the crime." *State v. Schroeder*, 95 Ariz. 255, 258 (1964). "Instead, the evidence

must be such that a rational juror could conclude that the defendant committed only the lesser offense." *Wall*, 212 Ariz. at 4, ¶ 18.

**¶18** Recklessness is the conscious disregard of a substantial and unjustifiable risk; and negligence is the failure to perceive such a risk. *See* A.R.S. § 13-105(10)(c)-(d). In this case, Allee asserted an "all-or-nothing" defense; he claimed that he accidently dropped Evangeline and otherwise implied that her injuries were part of a pre-existing condition due to the circumstances of her birth. "We recognize that a trial court is not automatically precluded from instructing on a lesser-included offense because a defendant elects to present an all-or-nothing defense." *State v. Bearup*, 221 Ariz. 163, 169, ¶ 26 (2009). However, "[a]s a practical matter, when a defendant asserts an all-or-nothing defense . . . there will 'usually [be] little evidence on the record to support an instruction on the [lesser-included] offenses.'" *Wall*, 212 Ariz. at 6, ¶ 29 (quoting *State v. Caldera*, 141 Ariz. 634, 637 (1984)). The same is true in this case.

**¶19** Allee argues the jury could have concluded he was reckless or criminally negligent when he allegedly held Evangeline over the bathtub, while wearing headphones and under the influence of prescription medicine, and without taking precautionary measures to protect her from a fall. Allee also asserts that the jury could have conceivably found that the State failed to prove he intentionally abused Evangeline.

**¶20** Evidence was presented that Allee had his headphones on when he allegedly dropped her; however, the evidence also showed that the music made him patient and calm when he handled Evangeline. No evidence was presented that the headphones or music negatively interfered with his ability to care for Evangeline in any way. In fact, Allee showed police that he was holding Evangeline with both hands when he allegedly dropped her. There was also no evidence presented that Allee took his medication that day, that he was under the influence, or that his medication ever interfered with his ability to handle Evangeline.

**¶21** Based on the extensive medical testimony, a rational juror could not conclude that Allee either recklessly or in a criminally negligent manner dropped Evangeline. And it is not enough to simply assert that a juror may disbelieve the State's evidence on one element of the offense. *See Schroeder*, 95 Ariz. at 258. The court did not abuse its discretion when it found the evidence did not support that Allee consciously disregarded or failed to perceive a substantial and unjustifiable risk.

II.     Unsolicited Witness Statement

¶22         During the investigation of Evangeline's injuries, the social worker and police observed that D.C. had bruising around one eye.  D.C. initially told the social worker that it was caused by a can falling from a shelf.  Later, D.C. told police that Allee hit her.  The prosecutor and Allee's counsel agreed evidence related to the bruised eye would not come into trial.  The prosecutor then admonished all of its witnesses to not discuss D.C.'s bruised eye.

¶23         At trial, the following transpired between the prosecutor and social worker:

> Q. What was your first impression of mom?
>
> A. She was obviously, you know, really concerned and didn't know what was going on, and we also noted she had a black eye.  So I just asked her, you know, are you okay?  Did anyone hurt you and she denied any of that.  She said a can had fallen on her face.

¶24         Allee's counsel immediately asked to approach and, outside the hearing of the jury, moved for a mistrial.  The court denied the motion, noting that the information was unsolicited and Allee was not implicated, causing no prejudice to him.  In order to not bring unwanted attention to the issue and cure the problem, the court sustained a hearsay objection regarding the answer and admonished the witness to not discuss hearsay statements.  The prosecutor then continued questioning the witness on another subject.  D.C.'s bruised eye was not raised again during the nineteen-day trial and Allee's counsel never requested a curative instruction.

¶25         Allee asserts that the superior court erred when it denied his motion for a mistrial because the jury could have inferred that Allee caused D.C.'s bruised eye, and therefore acted in conformity with such violent tendencies when he abused Evangeline.

¶26         "A declaration of a mistrial is the most dramatic remedy for trial error and should be granted only when it appears that justice will be thwarted unless the jury is discharged and a new trial granted."  *State v. Adamson*, 136 Ariz. 250, 262 (1983).  Therefore, the superior court "must evaluate the situation and decide if some remedy short of mistrial will cure the error."  *Id.*  We also recognize the superior court is in the best position to determine whether a mistrial is warranted because it "is aware of the

atmosphere of the trial, the circumstances surrounding the incident, the manner in which any objectionable statement was made, and the possible effect on the jury and the trial." *State v. Williams*, 209 Ariz. 228, 239 ¶ 47 (App. 2004).

¶27 The superior court must consider two factors when ruling on a motion for a mistrial based on a witness' testimony: "(1) whether the testimony called to the jurors' attention matters that they would not be justified in considering in reaching their verdict and (2) the probability under the circumstances of the case that the testimony influenced the jurors." *State v. Lamar*, 205 Ariz. 431, 439, ¶ 40 (2003).

¶28 The prosecutor and Allee's counsel agreed the evidence about D.C.'s bruised eye should not be solicited or admitted because the jury could not consider whether Allee caused D.C.'s bruised eye. However, nothing in the unsolicited statement reasonably implied that Allee caused the bruised eye. *See id.* at ¶ 42 (finding no prejudice when defendant was not implicated in statement); *see also* Ariz. R. Evid. 404(b) (other crimes, wrongs, or acts not admissible to prove character and action in conformity). Accordingly, the court did not err when it found the unsolicited testimony did not prejudice Allee.

¶29 Even assuming *arguendo* that the testimony was inappropriate, we cannot say that it influenced the jurors. The unsolicited testimony came on the sixth day of a nineteen-day trial, which mostly consisted of dense and complex medical testimony. *See, e.g.*, *State v. Laird*, 186 Ariz. 203, 207 (1996) (noting improper testimony was a "brief and tiny part of extensive trial testimony"). Additionally, as stated above, Allee was not implicated. The court's decision to sustain the objection on hearsay grounds to avoid unwanted attention was adequate. No curative instruction was requested or necessary, particularly in light of the court's instructions that the jury must disregard any answer when an objection is sustained; "[w]e presume that the jurors followed the court's instructions." *State v. Newell*, 212 Ariz. 389, 403, ¶ 68 (2006).

## CONCLUSION

¶30      For the foregoing reasons, we affirm Allee's conviction and sentence.



AMY M. WOOD • Clerk of the Court
FILED:   AA